# United States District Court
## District of Massachusetts

| | |
|---|---|
| Jimmy Evans,<br>    *Petitioner*, | )<br>)<br>) |
| v. | )    CA No.<br>) |
| Michael Thompson,<br>    Superintendent, MCI Shirley,<br>    *Respondent*. | )<br>)<br>) |

## Petitioner's Memorandum in Support of
## Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254

## Introduction

The annexed petition for federal habeas corpus relief stems from the petitioner's Massachusetts conviction for first degree murder in connection with the January 25, 1995, shooting death of Lyle Jackson at a late-night hamburger joint on Blue Hill Avenue in Roxbury. This petition raises important questions whether counsel's complete failure to conduct an independent forensic investigation in a first degree murder case amounted to ineffective assistance of counsel; about the severe curtailment of the defendant's right to confront two key Commonwealth witnesses; and about

-1-

the state appellate court's application of improper standards in determining the "facts" on which its legal analysis is grounded. While the state appellate court's decisions meet the "contrary to" and "unreasonable application" standards set forth in 28 U.S.C. § 2254 (d), the petitioner challenges herein the constitutionality of § 2254 (d) as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2241 et. seq.

## Statement of Prior Proceedings

On February 21, 1995, a Suffolk County, Massachusetts, grand jury handed down an indictment charging the petitioner Jimmy Evans ("Evans") with murder, two counts of possession of a firearm without a license, and two counts of unlawful possession of ammunition. In connection with the same incident, the grand jury also indicted the petitioner's older brother John Evans ("John"), as well as two of John's acquaintances Ronald Tinsley and Robert Brown.

After a jury trial in Suffolk County Superior Court, Evans was convicted on all counts, including first degree murder based on theories of deliberate premeditation and extreme atrocity and cruelty, and was sentenced to a prison term of life without parole on the murder conviction and to concurrent terms of five years on the gun possession charges (Tr.11/7-8, 26-

28).[1] The two ammunition possession charges were placed on file (Tr.11/26-27). John Evans was also convicted of first degree murder, while Brown and Tinsley were acquitted (Tr.11/6,8-10).

Evans filed a timely filed a timely notice of appeal to the Massachusetts Supreme Judicial Court ("SJC"), but that appeal was initially stayed pending the trial court's determination of a post-conviction motion filed under Mass. R. Crim. P. 30 (b). Evans also filed a series of motions seeking funds for experts to conduct forensic testing on the jacket worn by Tinsley and on the ammunition found at the scene in order to demonstrate that Tinsley committed the killing spontaneously without assistance from either of the Evans brothers. On December 30, 1999, after the substance of these motions was denied, a Superior Court judge issued written rulings denying these motions without an evidentiary hearing (A.30a-56a).

Evans filed timely notices of appeal of the denial of his post-conviction motions and this appeal was consolidated with his direct appeal. On April 16, 2003, the SJC issued an opinion affirming Evans' conviction and upholding the denial of his post-conviction motions (A.1a-29a). *See also*

---

[1] The appendix attached to this petition will be cited by page number as "(A. )"; the transcripts of the trial will be cited by volume and page number as "(Tr. / )."

-3-

*Commonwealth v. Evans*, 439 Mass. 184 (2003). The SJC denied Evans' timely petition for rehearing on June 5, 2003 (A.57a).

Evans filed a timely petition for writ of certiorari with the United States Supreme Court, which, on October 20, 2003, denied that petition.

## Statement of Facts

### 1. The Trial

#### A. Introduction

This case stems from the January 25, 1995, shooting of Lyle Jackson at a late-night hamburger joint on Blue Hill Avenue in Roxbury, Massachusetts. The Commonwealth contended that Jimmy Evans and his brother John were guilty as principals for having, themselves, shot Jackson and as joint venturers for having "act[ed] as a team" with Tinsley and Brown in shooting Jackson (Tr.3/17).

While Evans admitted having pulled a handgun for his own protection while outside the front door after hearing shots fired inside the snack bar, he testified that he did not know Jackson, that his gun accidentally discharged while pointed down and away from Jackson, and that he never fired any shots at Jackson. Although trial counsel failed to conduct an independent forensic investigation, the Commonwealth's forensic evidence was substantially

-4-

consistent with Evans' assertions.

**B.     The Commonwealth's Case**

The Commonwealth's case hinged on the testimony of three witnesses who gave substantially differing accounts of the shooting: 22 year-old Marcello Holliday, who claimed to have seen a gun being drawn by the petitioner but admitted that he left the premises before any shots were fired; Alton Clarke, who first approached the police with his evidence over nine months after the incident and seven months after aggravated rape charges had been lodged against him; and Marvette Neal, the bouncer at a local bar, whose trial testimony was, which at odds with his grand jury testimony and his statements to the police, was of no value to the prosecution.

*(1)     Marcello Holliday's Testimony.*

Marcello Holliday, a 22 year old friend of the victim Lyle Jackson, testified that at around midnight, he met Jackson and another friend Stan Pickman at "Cortee's Lounge" on Washington Street in Dorchester, Massachusetts (Tr.3/27,168). While Holliday was there to have a few drinks and "[m]ess with women," Jackson spent his time "gambling" (Tr.3/108,120). While at the bar, Holliday spotted Evans and his brother John, whom he knew, as well as the two other defendants (Tr.3/28,46).

At about 2:00 a.m., Holliday, Jackson, and Pickman left the bar and squeezed into Pickman's car across the street (Tr.3/33,102,121). Holliday, who had been drinking beer, testified that he saw John pulling out a "[s]ilver gun" as he ran and "shoot" at "six or seven" people across the street (Tr.3/33-37,109,123).

Without "wait[ing] for the police," Holliday, Jackson and Pickman drove to a small "late night" snack bar named Walaikum's (Tr.3/38). Walaikum's was "crowded" with "[a]bout fifteen, twenty" people inside (Tr.3/38,128). Holliday and his friends ordered some food and waited (Tr.3/38). Holliday stood "on the left hand side ... near the tables," while Jackson stood "[s]traight ahead" "at the counter" with his back to the door (Tr.3/44,97).

Holliday testified that 10 or 15 minutes later, he saw the four defendants "walk[ ] in, and then walk[ ] out," and "[t]hen ... c[o]me back in[to]" the snack bar, each time in "single file" (Tr.3/38,41,95). Holliday exchanged greetings with the Evans brothers (Tr.3/133-134). Although it was "loud" in Walaikum's, with "people cooking and making sounds and ... yelling out orders," Holliday claims to have heard Brown "whisper," "that's

one of them right there,"[2] that Evans asked whether that was "one of them," and that Brown said, "[y]eah" (Tr.3/46,47,131).

According to Holliday, Evans "pulled out of his waistline" a "chrome handgun with a black handle," at which point Holliday "ran out the door" toward Warren Street without looking back (Tr.3/47-50,101, 156). As he was nearing "the corner of th[e] next street," Holliday heard "[f]our to five shots" coming from Walaikum's (Tr.3/50,99-100). As he ran, Holliday saw a gold Lexus drive by with John Evans at the wheel (Tr.3/57).

Holliday returned to Walaikum's where Jackson was on the floor "spitting up" (Tr.3/59-62). Marvette Neal The bouncer at Cortee's and a woman named "April" were attending to Jackson (Tr.3/59-63).

Holliday was not interviewed by the police until almost three weeks after the shooting when he identified photographs of all four defendants (Tr.3/77-79;5/36). With his recollection refreshed, Holliday testified that Evans was wearing "a black hooded sweatshirt," that John was wearing a "reddish-tan leather jacket with a black and white checkered hat," that

---

[2] Holliday initially testified that Brown "whisper[ed]" this; later during his direct examination, he testified that Brown "didn't whisper" but rather "spoke out loud"; finally, on cross-examination, he reverted to his testimony that the words were uttered in a "whisper[ ]" (Tr.3/46,86).

-7-

Brown may have been wearing a "[r]eddish tan Pele Pele jacket," and, significantly, that Tinsley was wearing a "tannish goose down coat" (Tr.3/50-56,84).

The Commonwealth presented no evidence of any motive as to why Evans would have shot Jackson. Holliday acknowledged that Jackson had "never mentioned" anything about Evans and was not aware of any prior "incident[s]" between them (see Tr.3/120,163).

*(2)    Marvette Neal's Testimony.*

After a voir dire, the Commonwealth was permitted, over objection, to call Marvette Neal with the evident purpose of impeaching him (Tr.4/160-173). At trial, Neal testified that he "d[id]n't remember" seeing the "Evans brothers" either at the Cortee's Lounge or at Walaikum's; that he did not see the petitioner with a gun that evening and did not see him "shoot anyone"; that he was unable to identify the shooters; and that he never identified the petitioner as Jackson's assailant (Tr.4/175,181,193-195,198-199,201).

Despite this testimony, and despite his inability to recall the content of his testimony before the grand jury (Tr.4/182-186;7/25-26), the prosecution was nonetheless permitted to introduce as past recollection recorded, over objection, excerpts of Neal's grand jury testimony stating that he "believe[d]

-8-

he s[aw]" the Evans brothers at Cortee's and Walaikum's (Tr.4/177-180,182-186; 7/25/26).

In addition, the Commonwealth was allowed to introduce, again over objection, testimony by Boston Police Detective Kenneth Dorch that in an interview three weeks after the incident, Neal told him that he had seen the Evans brothers and two other black males "rush[ ]" into Walaikum's; that they "work[ed] their way toward the counter to order food"; that "Marquee stared at Lyle Jackson"[3]; that he "went outside" and "began to ratchet a silver automatic, semi-automatic handgun as if it were jammed"; that he "came back inside" and "fired four to five shots at Lyle Jackson"; that he again walked outside; and that the petitioner's brother "came back inside and ... fired three to four shots at Lyle Jackson" (Tr.5/13-17,31). According to Dorch, Neal also identified photographs of the Evans brothers as the shooters (Tr.5/20). All of this evidence was admitted even though Neal adamantly denied having ever made such statements to the police (Tr.4/193-195).[4]

---

[3]There was evidence that Neal knew Evans by his middle name "Marquee"

[4]The court gave limiting instructions that Dorch's testimony was to be considered for impeachment purposes only (Tr.5/17).

### (3) *Alton Clarke's Testimony*.

The only Commonwealth witness who claimed to have seen the shooting was Alton Clarke. Clarke — who did not approach the police until over nine months after the incident at a time when he had a charge for aggravated rape pending — provided a critically different account than Holliday, repeatedly claiming with "absolute certain[ty]" that the first person to draw a gun in Walaikum's was the driver of the Lexus (Tr.6/96,147, 173).

According to Clarke, after arriving at Walaikum's, he was waiting at the counter for his food when he saw a Lexus pull up" "in front" (Tr.6/80-82,139-140). After "hear[ing] three clicks," Clarke "turned around" and saw a black male with a "silver ... semi-automatic" (Tr.6/82-84,87). After a second "series of clicks," Clarke claims to have seen Jackson running away and "tumbling" to the ground as the gunman shot him "four to five times" (Tr.6/85-86,143).

As Clarke was fleeing the restaurant, a second black male with a "black gun" "placed a gun to [Clarke's] chest" (Tr.6/87). After Clarke stated that he had "nothing to do with this," the second gunman "walked over to where the first gunman was and as [Clarke] stepped out of the store a shot was fired" (Tr.6/87). Clarke observed the first gunman with the silver gun

-10-

get into the driver's seat of the Lexus while the second gunmen got into the front passenger seat (Tr.6/89,147). Clarke had "[n]o doubt in his mind" about this (Tr.6/89-90).

Clarke called 911 on his car phone, passed on the license plate number of the Lexus to a security guard, picked up a chicken dinner, and drove home (Tr.6/91). As he arrived home, Clarke saw the Lexus speeding by with nine or ten police cars in pursuit (Tr.6/94-95).

Clarke, who himself was five-eleven, described the first gunman as "five-nine, five ten," "[t]hickly built," while he described the second gunman as "much thinner" and "much younger" (Tr.6/89,113-116,151).[5] When subsequently shown an array containing photographs of the Evans brothers, Clarke was "unable to identify anyone" (Tr.6/95,83).

On cross-examination, Clarke admitted that he did not speak with the police about the incident until October 18, 1995 – about nine months after the shooting, and about seven months after he had been indicted on "serious charges ... in Suffolk County" (Tr.6/100).[6]

---

[5] Evans stood taller than 6'0" and weighed over 220 pounds (Tr.5/232-233).

[6] Although the jurors were never permitted to find out the nature of the charges, Clarke was facing three counts of aggravated rape, one count of kidnapping, and one count of assault and battery by means of a dangerous

-11-

*(4)    The Aftermath.*

There was testimony from several police officers about the pursuit of the Lexus by numerous police cars through the streets of Roxbury, Dorchester, and Mattapan; the apprehension of the defendants; and their booking at which the defendants gave false names (see Tr.5/44-72;73-130;141-148;150-211;217-227;228-244). During the car chase, one of the guns was seen being tossed out of the front passenger window, while a second gun was seen being tossed out the same window "200 or 300 feet" down the street (Tr.4/109,111). Both guns were later recovered (Tr.4/126-127,131).

When the Lexus was stopped, Evans emerged from the front passenger door and Tinsley from the rear passenger door (Tr.5/161-164).Evans was wearing a "black hoodie," while Tinsley was wearing a "tan three-quarters length jacket" (Tr.5/62,66,71,230,234).

---

weapon. For the subsequent history of Clarke's then-pending charges, *see Commonwealth v. Clarke*, 48 Mass. App. Ct. 482 (2000) (reversing convictions on two counts of aggravated rape and one count of kidnapping at second trial, the first having ended in a mistrial), and S.C. , 60 Mass. App. Ct. 1105 (2003) (affirming convictions on two counts of aggravated rape, one count of kidnapping after third trial).

### (5) *The Forensic Evidence*

Two .9 mm semi-automatic handguns were admitted into evidence, a silver and black Rueger (Exh.43), and a black Heckler & Koch (Exh.42) (Tr.7/33,42; see also Tr.3/180-189; Exh.13-21). With the exception of a fragment lodged in a rug in the middle of the restaurant, all of the ordnance from the silver gun was found just outside the front door or near the right side of the front counter away from Jackson's body. According to the Commonwealth's ballistics expert, four shots were fired from the silver Rueger and three shots from the black H&K (*see* Tr.7/29,82-83). All three shell casings found "on the sidewalk in front of the store" and a fourth found "in front of the counter and near the wall," "on the right side," away from Jackson's body were linked to the silver Rueger (Tr.7/51-54,60-63,76,95).

Inside the restaurant, near one corner, a "bullet hole" was found in the "lower portion" of the "front counter," a "few inches off the floor" near the corner (Tr.7/69,88,91). A "copper jacket fragment" matching the silver Rueger was lodged in "the base of the refrigerator ... behind the counter" along the same trajectory (Tr.7/69,72). Other fragments found "near the refrigerator" were linked to the silver Rueger (Tr.7/80).

According to the Commonwealth's ballistics expert, who was unsure

-13-

whether any of the ballistics evidence had been moved before he arrived (Tr.7/95), a "copper jacketed fragment" linked to the silver Rueger was retrieved from a "brown rug ... in the middle" of the floor (Tr.6/28-30; 7/78-79,87; Exh.60). Blood on that bullet was never tested. The prosecution presented no evidence that any effort was made to properly secure the crime scene.

"[T]he bulk of the other ballistics items" which was recovered "in the other corner," on the "left-hand" side of the snack bar, closer to Jackson, was positively linked to the black H&K (Tr.7/91-92). These items included three discharged shell casings on or near a bench, a "copper jacketed spent bullet," as well as a "spent bullet" retrieved from Jackson's body (Tr.7/81,91-92). No ordinance from the silver gun was found in or near the corner where Jackson was shot (Tr.11/7/96-74).

The Commonwealth also presented evidence that blood was found on the tan coat linked to Tinsley. A police criminalist testified that both Tinsley and Jackson had group A blood, and explained that the A and H antigens on the tan coat would have been consistent with a mixture of type "A blood or ... a mixture of A and O blood" (Tr.6/35-36). No "subgroup testing" was done to further distinguish the blood (Tr.6/36), and no DNA testing was

-14-

performed.[7]

The prosecution presented medical evidence that Jackson had received a "perforating wound" to the left forearm" near the elbow; a "re-entry" wound to the "left chest" apparently caused by the same bullet; two other "entrance wounds" to Jackson's left chest, and two "exit wounds" to his right chest (Tr.7/109-110,119-121). According to the medical examiner, these wounds were consistent with three shots to the left side of Jackson's body (Tr.7/127). The cause of death was "sepsis due to multiple gunshot[ ] wounds" (Tr.7/131).

### C.  The Petitioner's Case.

According to Evans, he went to Cortee's "a little after" midnight where he bumped into his brother John and John's two friends Robert Brown and Ronald Tinsley whom Evans had met on only a few previous occasions (Tr.9/10-11). Evans left Cortee's with his brother to go to another bar named Conway's, followed by Tinsley and Brown in another car (Tr.9/10,12). Evans testified that he did not see anyone fire shots outside Cortee's

---

[7]Tests performed on Jackson's clothing "did not detect the presence of gunshot residue," indicating that the shots were fired from at least three feet away (Tr.6/15). No tests for gunpowder residue were performed on any of the clothing worn by the defendants (Tr.6/38).

(Tr.9/13). After staying at Conway's for a while, the four left together in John's car (Tr.9/13-14).

Although Evans had originally asked John to drop him at home, they decided to stop for food at Walaikum's (Tr.9/14). "Everyone got out," but only Evans and Tinsley approached the snack bar, while Brown and John remained "down by the car" (Tr.9/14-16). Evans entered the snack bar after Tinsley, but on seeing how "crowded" it was inside, "immediately turned around," and stood for "[a]bout two or three minutes" "outside of Walaikum's down a few steps from the front" (Tr.9/15-16).

Standing with his "back turned," Evans suddenly "heard shots" and saw people, including Tinsley, "rushing out" the door (Tr.9/17,18). Evans admitted that he pulled a silver .9 mm Rueger semi-automatic handgun from his waistband, that he knew the gun was loaded, and that he "pulled the slide back" (Tr.9/19,35). He stated that he did so in order to protect himself (Tr.9/19).

As he began "backing up," Evans, who was "nervous," held the gun pointed "down" with his finger on the trigger (Tr.9/19-20). As he pulled the release back, "it got kind of stuck," so he "pulled a little harder," but when he accidentally "let go" of the release, the gun "went off," firing three shots

(Tr.9/19-21,28). No one was in front of him when the shots went off (Tr.9/21). Evans denied firing the gun to "assist ... Tinsley in getting out of" Walaikum's (Tr.9/52-53,55-56).

When Evans reached the car, he found John "already seated in the front driver's side," with Brown seated "directly behind" him (Tr.9/21-22). Evans climbed into the front passenger seat, Tinsley climbed into the seat behind him, and the car took off (Tr.9/21-22).

When John briefly pulled the car over on Warren Street, Evans "got out" for "a few seconds," and as he was getting back in, he heard John tell Tinsley to "[g]et the fuck out of [the] car," although John continued on without making Tinsley get out (Tr.9/23,55).

When an unmarked cruiser pulled up directly behind them at a red light, Evans told his brother that he had a gun in his possession which made his brother angry (Tr.9/24). The car sped off with the cruiser following them. During the ensuing chase, Evans "thr[e]w [the silver] gun out of the car" (Tr.9/25). He was unsure what Tinsley did with the black gun (Tr.9/49). Evans, who confirmed that he was wearing a "black hooded sweatshirt" (Tr.9/35,36), was apprehended by the police shortly after the car was chased to a halt on a dead-end street (Tr.9/25-26). He admitted that he gave the

-17-

police false identifying information when booked (Tr.9/38).

Evans adamantly denied that there had been any conversation about Jackson either "[o]n the way to Walaikum's" or after leaving it, and testified that he did not know either Jackson or anyone else in Walaikum's (Tr.9/27,29).

Although there was evidence pointing to Tinsley as the lone gunman, Evans, when asked by the prosecutor whether he was "blaming the shooting ... on Tinsley," stated that he "didn't see" the shooting and "can't tell you what happened inside the store" (Tr.9/42). Evans acknowledged that he "never heard" Tinsley admit shooting Jackson (Tr.9/42,44).

**D.    The Co-Defendant John Evans' Case.**

*(1)    John Evans' Testimony.*

The only other defendant to put on evidence was the petitioner's brother John (Tr.8/33). John's testimony substantially conformed to the petitioner's in all critical respects.

John added, however, that after the four arrived at Walaikum's, as Evans and Tinsley headed toward the restaurant, Brown went off in the opposite direction apparently to relieve himself, while he (John) went over to the front passenger seat and chatted for several minutes with two men and a

woman whom he knew as "Tasha" (Tr.8/45-51,112). John testified that he saw Evans emerge from Walaikum's and stand by the front door (Tr.8/52). Within minutes, John heard "some gunshots" that "sounded real close," at which point he observed people rushing out of Walaikum's (Tr.8/53-54). After John got into the driver's seat, Brown told him to drive off, but he refused to do so without Evans (Tr.8/54-55,58).

Shortly thereafter, Evans got into the front passenger seat, while Tinsley climbed into the rear passenger seat (Tr.8/57). During the car ride, Tinsley stated that he had been "in line, it was crowded, a dude pushed him", and when he did it again, Tinsley said he "had to handle [his] business," explicitly admitting that he "shot [the dude's] ass" (Tr.8/61,66). John testified that he stopped the car and told Tinsley to get out, but Evans persuaded him not to make Tinsley do so (Tr.8/67).

Noticing that the police had pulled behind them at a red light, Tinsley urged John to "pull off" when the light turned green (Tr.8/71-72). After Evans informed John that he also had a gun, John observed him toss the gun out the window (Tr.8/73-76). John confirmed that Tinsley had been wearing "a tan coat with a hood on it" (Tr.8/79).

John testified that after being cornered on a dead end street, he "put[

-19-

his] hands up but an officer nonetheless "walk[ed] up to [him] and punche[d] him in the mouth" (Tr.8/74). John denied shooting Jackson, and further denied having even known him (Tr.8/81,83).

*(2)    Willie Wiggins' Testimony.*

John Evans also called to the stand Willie Wiggins, the owner of Walaikum's. Wiggins was behind the counter cooking, when he observed an unidentified black male in a "tan jacket" standing outside "snap[ping] his pistol" and "pull[ing] it back" (Tr.8/181, 183,188). According to Wiggins, the gunman in the tan jacket "walked right over to [Jackson]" and shot him (Tr.8/183,186-190). Wiggins, who claimed to have known John as "Randy Evans," testified that he did not see any of the defendants in his snack bar that night (Tr.8/186,190-191).

Wiggins explained that the coat worn by the shooter was a "tan leather coat" and that he had told the police it was a "light tan coat" (Tr.8/199,213, 218). When the police showed him brown leather jackets apparently seized from Robert Brown and John Evans, he told them that the shooter's coat was "a light tan not this particular color" (Tr.8/227). Wiggins added that the lone gunmen was about "five-nine," "five-foot-ten," "medium to thin build," with a "fair complexion," and that he "didn't see any black sweatshirt" on him

-20-