(Tr.8/203,213,219, 222).

## 2. Post-Conviction Proceedings.

After trial, Evans and his brother filed new trial motions, asserting, among other things, that they had been denied their right to effective assistance of counsel under the state and federal constitutions and that the exclusion of certain evidence and the admission of other evidence at their trial had violated their federal and state constitutional rights. In support of the motions, they submitted affidavits presenting newly discovered evidence, including: 1) evidence that "Tasha" was unavailable at the time of trial but would have testified that John was never inside Walaikum's that evening; 2) evidence that had Robert Brown been available, he would have testified that he heard Tinsley confess to the shooting; and 3) evidence that Evans' trial counsel failed to consult with a blood expert, a ballistics expert, a fingerprint expert, or even an investigator to assist in preparing the defense, not for any "tactical" reasons but simply because he was "not aware at the time of any advantage in consulting with" such experts.

In a written order dated December 30, 1999, the motion judge (Donovan, J.), who was not the trial judge, denied the defendants' post-conviction motions, ruling that their "documentation ... d[id] not raise a

'substantial issue' requiring an evidentiary hearing" (A. 35a).

Evans appealed the denial of his new trial motion to the Massachusetts SJC and this appeal was consolidated with his direct appeal. Again, the petitioner asserted, among other things, that his federal and state constitutional right to effective assistance of counsel had been violated and that the trial court had improperly allowed the prosecution to introduce Marvette Neal's grand jury testimony as past recollection recorded in violation of petitioner's federal and state constitutional confrontation rights.

On April 16, 2003, the SJC issued its opinion, rejecting petitioner's claims and affirming his convictions. *Commonwealth v. Evans*, 439 Mass. 184 (2003). In that opinion, the Court rejected Evans's ineffective assistance of counsel claim by concluding that any deficiencies did not prejudice Evans. *Id.* at 201-02. Additionally, while the SJC found that Marvette Neal's grand jury testimony had been improperly admitted, it concluded that this error was harmless. *Id.* at 191.

Petitioner filed a petition for rehearing in which he asserted, inter alia, that the Court had erred by effectively applying the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), outside the insufficiency-of-evidence context. The SJC denied petitioner's petition for rehearing on June

5, 2003.

Evans sought certiorari from the United States Supreme Court. On October 20, 2003, the Supreme Court denied Evans's petition for a writ of certiorari.

## Argument

### 1. The Standard for Relief Under AEDPA.

#### A. The Standards Set Forth in § 2254 and *Williams v. Taylor*.[8]

Under 28 U.S.C. §2254(d), a writ of habeas corpus will issue only where the state court's adjudication of a federal claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as decided by the Supreme Court of the United States."[9] This requires a two-step determination: 1) whether a constitutional violation has occurred; and 2) whether the state appeals court's ruling was contrary to or involved an unreasonable application of clearly established federal law.[10]

---

[8] 529 U.S. 362, 406 (2000).

[9] 28 U.S.C. §2254(d)(1).

[10] *See Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001) ("[t]he habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted").

Under the "contrary to" clause, the writ may be granted "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. at 406.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the petitioner's case." *Id.* at 412. For the application of a legal rule to be unreasonable, there must be 'some increment of incorrectness beyond error" that is "great enough to make the decision unreasonable in the independent objective judgment of the federal court." *Id.*, quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).[11]

Where a federal claim was timely raised but left unresolved by the state appellate court, however, AEDPA's "strict standards do not apply" and the

---

[11] *See also McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002); *Nom v. Spencer,* 337 F. 3d 112, 116 (1st Cir. 2003) ("if the petition presents a close call, it must be rejected, even if the state court was wrong").

-24-

federal habeas court must examine the claim de novo.[12]

**B. While the petitioner uses the above-noted standards in making his argument below, the petitioner herein challenges the constitutionality of AEDPA's habeas corpus provisions.**

Although the scope of habeas corpus is at least partly a creature of Congressional enactment and did not, until the 1867 amendments to the Judiciary Act of 1789, explicitly cover state prisoners incarcerated after criminal trials, see *Felker v. Turpin*, 518 U.S. 651, 663-664, 116 S. Ct. 2333, 2339-2341 (1996), to the extent that the Fourteenth Amendment's Due Process Clause has come to "incorporate" the fundamental rights of state prisoners to habeas corpus relief along with the host of other fundamental criminal procedure protections that have been incorporated from the Bill of Rights by the Fourteenth Amendment,[13] it should be clear that the

---

[12]*Horton v. Allen*, 370 F.3d 75, ___ (1st Cir. 2004), citing *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001), and *Nom v. Spencer*, 337 F. 3d 112, 116 (1st Cir. 2003).

[13]See *Wolf v. Colorado*, 338 U.S. 25, 27 (1949) (Fourth Amendment right against unreasonable searches and seizures); *Mapp v. Ohio*, 367 U.S. 643 (1961) (Fourth Amendment exclusionary rule); *Benton v. Maryland*, 395 U.S. 784 (1969) (Sixth Amendment protections against double jeopardy); *Malloy v. Hogan*, 378 U.S. 1, 10-11 (1964) (Fifth Amendment privilege against self-incrimination); *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (Sixth Amendment right to speedy trial); *In Re Oliver*, 333 U.S. 257, 278 (1948) (Sixth Amendment right to public trial); *Duncan v. Louisiana*, 391 U.S. 145, 154 (1968) (Sixth Amendment right to jury trial); *Pointer v. Texas*,

Constitution's Suspension Clause, Art. I, § 9, cl. 2, not only "protects the writ as it existed in 1789," but also protects the writ as it exists today in light of the past two centuries of constitutional and legal developments.[14] Because AEDPA's habeas corpus provisions, in general, and § 2254 (d) in particular, has so diminished the scope of the relief available, they have transmogrified the "Great Writ" into a puny spectre of a remedy that does not stand up to

---

380 U.S. 400, 403 (1965) (Sixth Amendment right to confrontation); *Washington v. Texas*, 388 U.S. 14, 18-19 (1967) (Sixth Amendment right to compulsory process); *Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963) (Sixth Amendment right to counsel); *Robinson v. California*, 370 U.S. 660, 667 (1962) (Eighth Amendment right against cruel and unusual punishment). *See also* Jordan Steiker, *Incorporating the Suspension Clause: Is There a Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 Mich. L. Rev. 862 (1994) (explaining how the Fourteenth Amendment's Due Process and Privileges and Immunities Clauses incorporated the Suspension Clause's "Privilege of the Writ of Habeas Corpus" to state prisoners challenging state convictions); Eric M. Freedman, *The Suspension Clause in the Ratification Debates*, 44 Buff. L. Rev. 451, 455 (1996) (noting that "participants in the ratification debates, were they among us today, would support the independent judicial examination on federal habeas corpus of all convictions, state or federal").

[14]*See Felker*, 116 S. Ct. at 2340("assum[ing] that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789," *citing Swain v. Pressley*, 430 U.S. at 385 [Burger, C.J., concurring]). *See also INS v. St. Cyr*, 533 U.S. 289, ___, 121 S. Ct. 2271, 2279-2280 (2001).

constitutional scrutiny.[15]

By its own terms, § 2254 (d) explicitly limits relief to the narrow class of petitioners who can show not only that they are being unlawfully or unconstitutionally detained, but also that the errors that caused their detention involved an "objectively unreasonable" application of "clearly established" Supreme Court precedent. *See Williams v. Taylor,* 529 U.S. at 406. *See also Hurtado v. Tucker,* 245 F.3d 7, 16 (1st Cir. 2001) ("[t]he habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted"). In the vast majority of cases, where a state appellate court's decision is clearly wrong but not "unreasonable" or patently "contrary to" explicitly articulated Supreme Court precedent, §2254 as amended by AEDPA fails to provide meaningful habeas corpus relief against "unlawful or unconstitutional detention. As a result, "the risk of erroneous deprivation' of a detainees liberty interest is unacceptably high," *Hamdi v. Rumsfeld,* ___ U.S. ___, 124 S. Ct. 2633, 2662 (2004) (citation omitted).

---

[15]Although *Williams v. Taylor,* 529 U.S. at 406, as a matter of statutory interpretation, explicates the meaning of § 2254's "unreasonable application" and "contrary to" requirements, nowhere does it address the constitutional claims raised herein.

-27-

This critical deficiency — that the writ longer provides protection for the vast majority of those unlawfully detained — is constitutionally objectionable for three distinct, though related, reasons. First, § 2254 (d)'s "unreasonable application" requirement effectively constitutes an unconstitutional "suspension" of the writ by Congress during a period of civil tranquility in violation of Art. I, § 9, cl. 2.

Second, § 2254's "unreasonable application" requirement effectively substitutes a new remedial regime that fundamentally differs from "the Writ of Habeas Corpus" enshrined in Art. I, § 9, cl. 2, and that constitutes "habeas corpus" relief in name only.

Third, § 2254, by unduly restricting the availability of the writ, also fails to adequately protect the "[f]reedom from bodily constraint" that lies "at the core of the liberty protected by the Due Process Clause[s]" of the Fifth and Fourteenth Amendments. *See Parham v. J.R.*, 442 U.S. 71, 80 (1979).

Fourth, Article III prohibits federal court deference to state court rulings on interpreting and applying federal law. Article III "vests" the "judicial Power of the United States," in the federal courts, and "extend[s]" it "to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States." United States Constitution, Article III, §§ 1, 2.

-28-

Since the early days of our republic, the Article III "judicial Power" has encompassed both the authority and the obligation to declare "what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (declaring that "[i]t is emphatically the province and duty of the judicial department to say what the law is," and that "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule"); *Martin v. Hunter's Lessee*, 14 U.S. 304, 348 (1816) (warning of the "public mischiefs" that would ensue if "[j]udges of equal learning and integrity, in different states, might differently interpret a statute" if "there were no revising authority to control these jarring and discordant judgments"). *See also United States v. Nixon,* 418 U.S. 683, 704-05 (1974). Upholding § 2254 (d) "unreasonable application" standard unconstitutionally bars the federal courts from fully exercising their Article III obligation to independently review cases that are properly within their jurisdiction. *See Wright v. West*, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring) ("federal courts, even on habeas, have an independent obligation to say what the law is").

Whether or not there were limitations on the availability of the writ at

-29-

the time of the framing or ratification of the Constitution,[16] it is clear that the writ of habeas corpus as it has evolved in the past two centuries was developed to provide an effective remedy for ***all detentions*** found to violate federal laws or the federal constitution — at least where the error at issues "undermine[s] confidence in the fundamental fairness of the state adjudication," *Williams v. Taylor*, 529 at 374-375, citing *Teague v. Lane*, 489 U.S. 288, 311-314 (1989), and other cases — not merely those detentions that the reviewing court believes to be "unreasonable." *See Ex Parte McCardle*, 73 US (6 Wall.) 318, 325-6 (1867) (referring to "the Great Writ" as "a judicial remedy for every possible case of privation of liberty contrary to the National Constitution, treaties or laws" whose scope is "impossible to widen"); *Hamdi v. Rumsfeld,* 124 S. Ct. at 2662 (Scalia, J., dissenting) (observing that writ of habeas corpus — "the only common-law writ to be explicitly mentioned in the Constitution" — had, by the time of the Habeas Corpus Act of 1679, evolved into an effective "means to protect against the practice of arbitrary imprisonments" and came to be recognized as a "second

---

[16]As noted above, there are strong reasons why these limitations — which were partly the function of our pre-Civil War, pre-Fourteenth Amendment Constitution — are no longer applicable.

-30-

magna charta, and stable bulwark of our liberties").[17]

To the extent that the habeas corpus provisions of AEDPA are properly deemed unconstitutional, this Court should afford the petitioner de novo review of all of his constitutional claims raised herein. *See, e.g., Brown v. Allen*, 344 U.S. 443 (1953).[18]

2.  **Counsel's Complete Failure to Retain an Investigator to Develop the Factual Basis for the Defense and to Hire Forensic Experts to Conduct Critically Important Scientific Tests Deprived the Petitioner of the Effective Assistance of Counsel.**

Claims of ineffective assistance are to be evaluated under the familiar

---

[17]This atrophy of the Great Writ has been particularly disturbing given that habeas corpus "has come to be broadly adopted by other peoples and nations as a universal and fundamental human right. *See* International Covenant on Civil & Political Rights, Dec. 19, 1996, 999 U.N.T.S. 171, Article 9(4) ("[a]nyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention *and order his release if the detention is not lawful*"). *But see Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, ___ (2003) (observing that the Covenant is not "self-executing" even though the United States ratified it and is a party).

[18]In a series of recent decisions, the United States Supreme Court has made it clear that the federal courts should remain prepared to apply constitutional first principles in every case, even where a given statutory or rule-based regime has been in place for years. *See, e.g., Apprendi v. New Jersey*, 530 U.S. 466 (2000) ; *Crawford v. Washington*, ___ U.S. ___, 124 S. Ct. 1354 (2004); *Blakely v. Washington*, ___ U.S. ___, 124 S. Ct. 2531 (2004).

two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668, 690-691 (1984): 1) whether counsel's performance amounted to "unreasonable representation under prevailing professional norms," i.e., whether "counsel's performance was deficient"; and 2) whether counsel's deficient performance prejudiced his client's cause, i.e., whether "counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable." In order to establish prejudice, the petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The constitutional right to the effective assistance of counsel places on defense counsel the duty to conduct an independent investigation of the facts at issue, including an investigation of the forensic evidence on which the prosecution's case rests. *See Strickland*, 466 U.S. at 690-691. *See also Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003); *Williams v. Taylor*, 529 U.S. at 395-396. While "thorough investigation[s]" are "virtually unchallengeable" on appellate or habeas review, the federal courts, even post-AEDPA, have afforded relief where counsel has failed to fulfill his Sixth Amendment "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

-32-

U.S. at 690-691; *Williams v. Taylor*, 529 U.S. at 395-396 (holding that counsel had failed to "fulfill their obligation to conduct a thorough investigation of the defendant's background" and *citing* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 [2d ed. 1980]); *Wiggins*, 123 S. Ct. at 2535-2536.

By the time that the Massachusetts SJC reached its decision in the instant case on April 16, 2003, there is no question but that "clearly established" United States Supreme Court precedent held that a defense attorney's "decision to limit [his] investigation into potential mitigating evidence" will constitute a Sixth Amendment violation where the *Strickland* criteria are squarely met. *See Williams v. Taylor*, 529 U.S. at 395-396. *See also Wiggins*, 123 S. Ct. at 2535-2536 (finding that these principles were "clearly established" in *Strickland*, itself).[19]

---

[19]*See also Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) (granting habeas corpus relief based in part on trial counsel's failure to consult with DNA and other forensic experts), *pet. for rehear'g vacated*, 268 F.3d 485 (7th Cir. 2001) (rehearing petition vacated by agreement of parties); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (granting habeas corpus relief based in part on trial counsel's failure to prepare to cross-examine prosecution's blood expert); *Baylor v. Estelle*, 94 F.3d 1321 (9th Cir.), *cert. denied*, 520 U.S. 1151 (1996) (granting habeas corpus relief based in part on trial counsel's failure to pursue exculpatory serological evidence); *Stouffer v. Reynolds*, 214 F.3d 1231, 1234 (10th Cir. 2000) (granting habeas corpus relief based in part on trial counsel's failure to seek funds "to hire experts to examine the opinions


In the instant case, trial counsel's *complete* failure to conduct an independent investigation, including his failure to hire either an investigator of his own or forensic experts who could have conducted critical scientific tests was constitutionally "deficient," amounting to "unreasonable representation under prevailing professional norms" in a first degree murder case which hinged so critically on forensic evidence." *Strickland*, 466 U.S. at 690-691); United States Constitution, Amendment VI & XIV. While the prosecution conducted forensic testing and had forensic experts testify at trial, defense counsel did not even *consult* with a single forensic expert. Indeed, trial counsel admitted in his affidavit that he never "move[d] for funds for" or even "consult[ed] with": (1) a blood expert who could have performed blood typing and DNA tests on the blood found on the tan coat linked to Tinsley; (2) a ballistics expert who could have examined the ordnance and the firearms found at the scene, and could have evaluated the prosecution's ballistics evidence; (3) a fingerprint expert who could have

---

of the state's expert witnesses"). The Massachusetts courts have also found Sixth Amendment violations where counsel has failed a defendant by not conducting a proper investigation. *See Commonwealth v. Farley*, 432 Mass. 153 (2000); *Commonwealth v. Roberio*, 428 Mass. 278 (1998); *Commonwealth v. Haggerty*, 400 Mass. 437 (1987); *Commonwealth v. Conley*, 43 Mass. App. Ct. 385, 393-396 (1997).

examined the firearms and evaluated the prosecutions fingerprint tests; (4) a criminalist who could have evaluated the defects in how the police secured the crime scene; or (5) an investigator to conduct an independent investigation of the homicide (A. #). Counsel also admitted that he failed to do "these things, not because there was any tactical advantage in not doing so," but because he "was not aware at the time of any advantage in consulting with" these types of experts (A. #).

The state appellate court's conclusion that "there was no reason for counsel to believe that any testing would benefit the defense or that any hoped for results would likely have influenced the jury's conclusion," *see Commonwealth v. Evans*, 439 Mass. 184, 201 (2003), was plainly an unreasonable application of the well-established law articulated in *Strickland*, *Williams*, and *Wiggins*. Had trial counsel consulted with the proper forensic experts, the defense would have had at his disposal highly probative evidence as to whether the blood found on the tan coat linked to Tinsley was the victim's, whether there was gunpowder residue on the sleeves of the coat, whether it showed evidence of bloodstain patterns that are the hallmarks of "back spatter," all of which would have powerfully corroborated the defense evidence pointing to Tinsley as the shooter.

-35-

The SJC asserted that forensic experts would not have been of any assistance because the jury "could [have] infer[red]" that the bloody bullet found on the rug had "passed through the victim's body" and that "there was no evidence that the bullet had been moved," because "even if Tinsley had shot the victim," Evans had "admitted being the one who shot the Ruger from which a bullet was fired that passed through the victim's body," and because the "evidence of joint venture was overwhelming." *Evans*, 439 Mass. at 201. These assertions are patently unreasonable for several reasons. First, the SJC's reasoning ignores the fact that the Commonwealth's witnesses *all* depicted the Evans brothers as the shooters to the exclusion of the other defendants. Evidence that Tinsley was the shooter would have thoroughly impeached Holliday and Clarke, as well as Neal's hearsay statements purportedly made to Officer Dorch, and would have completely undermined the credibility of these witnesses. Second, evidence that Tinsley was the shooter would have powerfully corroborated Evans' testimony that his shots were fired toward the ground away from the victim's body recklessly or negligently, evidence that, if credited by the jurors, might have constituted either a complete defense to the charges as it would have shown that the discharge of the shots was accidental and not part of any joint venture, *see*

-36-

*Commonwealth v. Zezima*, 387 Mass. 748 (1982), or, at the very least, might have negated deliberate premeditation, extreme atrocity or cruelty, or malice aforethought, reducing the jury's verdict to second degree murder or manslaughter. Fourth, the SJC's reasoning also blinkers the crucial fact that an independent forensic investigation would have tested the unchallenged assertions of the Commonwealth's experts that the bullet fragment was in fact linked to the silver Rueger, that it contained traces of the victim's blood, and that it had not been moved.

It cannot be seriously contended that counsel made a "tactical decision" as counsel, himself, conceded that his failure to hire forensic experts was not made for "tactical" reasons but rather because he was "not aware" of "any advantage" in conducting a forensic investigation (A.62a-64a). Moreover, counsel's decision not to conduct such an investigation can never be "justified as a tactical decision" where counsel has not "fulfill[ed] [his] obligation to conduct a thorough investigation." *Wiggins*, 123 S. Ct. at 2535 (quoting *Williams*, 529 U.S. at 329).

Counsel's failure to conduct an investigation here was particularly devastating to the petitioner in that the Commonwealth's case was riddled with serious gaps and inconsistencies. While Holliday neatly placed all four

defendants in the snack bar, Holliday did not see the shooting, as he was "in and out" of the snack bar and was halfway around the block when the shots rang out. The jury did not fully credit Holliday's testimony as they acquitted Brown even though Holliday had placed Brown inside the snack bar fingering Jackson as "one of them," testimony that if believed would have clearly made Brown guilty as a joint venturer. Moreover, Holliday's recollection as to what the defendants were wearing that evening was noticeably weak until refreshed by studying descriptions contained in a police report. While Holliday's motives to fabricate were left unexplored, he clearly seemed interested in holding someone responsible for the murder of his best friend.

Alton Clarke's testimony, moreover, was dramatically at odds with Holliday's inasmuch as he was "absolutely certain" that the silver gun had been in the hands of the driver, who was widely identified as John Evans. Clarke was unable to identify either of the two gunmen, nor was he able to describe what they were wearing. Moreover, Clarke's testimony was fundamentally suspect in that it was given while aggravated rape charges were pending against him. Finally, Clarke's claim that the gunman with the silver gun shot Jackson "four to five times" (see Tr.6/85-86), was squarely

-38-

contradicted by the forensic evidence which placed all but one of the shell casings and bullet fragments from that gun either outside or on the right side of the restaurant away from Jackson's body.

Even if the Commonwealth had been properly permitted to present the prior statements of Marvette Neal to the police and the grand jury, his testimony at trial was confusing and contained an express denial of having ever identified the defendant or his brother as the gunmen. Neal's testimony about having first heard "clicking" sounds from the silver gun, ran contrary to the evidence that it was the black H&K which made the distinctive "clicking sound" (Tr.7/43).

Perhaps most significantly, there was critical testimony from both Clarke and Wiggins that one of the gunmen was wearing a light tan coat (see Tr.8/199,213, 218), which was linked to Tinsley by Holliday (Tr.3/50-56,84), John Evans (Tr.8/79;5/230), and the officer who apprehended Tinsley (Tr.5/61). Although neither the Commonwealth nor the defendants bothered to test it, blood matching both Tinsley's and the victim's blood grouping was found on the tan coat (Tr.6/36).

The forensic evidence substantially supported the defendant's version of the events as virtually all of the shell casings and bullet fragments linked

-39-

to his silver Rueger were found outside or near the front door. The location of the spent bullet in the refrigerator behind the front counter toward the right side of the snack bar fit with his testimony that he had been pointing his gun forward and down when it accidentally discharged. Moreover, in the absence of any evidence that the police had properly secured the crime scene, the location of a bullet fragment on the rug and a shell casing inside the restaurant on the right hand side was consistent with a patron's or police officer's accidentally kicking or otherwise moving it after the incident. In addition, the localization of the shell casings and spent slugs from the black H&K on the left-hand side of the restaurant where Jackson was shot, the existence of only three perforation wounds to Jackson, along with the finding of a slug matching the black gun having been extracted from Jackson's abdomen, was plainly consistent with the black gun's having been the murder weapon, and, most likely, the only gun fired at Jackson.

Finally, the Commonwealth failed to present any evidence of motive. Even Holliday, who had been Jackson's best friend since childhood, testified that Jackson had never mentioned the defendant's name before, nor had he been aware of any problems between Jackson and either of the Evans brothers.

-40-