Even though the writ should issue because the resulting prejudice clearly satisfied *Strickland*, where as here counsel's deficient performance – by failing to subject the prosecution's forensic evidence "to meaningful adversarial testing" — is so inherently "likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 548, 658 (1984). Under these circumstances, prejudice should be presumed. *Id.* at 659.[20]

In this day and age of advanced fingerprint testing, ballistics analysis, and DNA testing, trial counsel's *complete* failure to conduct an independent investigation by hiring qualified experts who could have conducted critical scientific tests should be presumed to have prejudiced Evans in the context of a first-degree murder case that hinged so critically on forensic evidence. The cost of requiring defendants to establish that this type of failure on the part of counsel caused prejudice is too great. DNA testing has led to the exoneration of at least 123 wrongly convicted people in the United States. Barry C. Sheck and Sarah L. Tofte, *Gideon's Promise and the Innocent Defendant*,

---

[20]Even if the Court concludes, however, that a showing of prejudice is required, the state appellate court, as explained below, ignored clearly established Supreme Court precedent when conducting its prejudice analysis.

Champion (January/February 2003). When trial counsel fails to obtain the kind of testing that has led to these exonerations, the defendant should not be required to prove that he was actually prejudiced by the failure, and courts should not be permitted to speculate about the various paths to conviction the jurors might, nonetheless, have pursued.

Furthermore, while the courts have recognized that the Constitution does not necessarily guarantee criminal defendants during the course of state post-conviction proceedings certain constitutional rights that they would otherwise enjoy before and during trial, *see Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano,*, 492 U.S. 1 (1989), where, as here, the provision of funds for a scientific expert during post-conviction proceedings is necessary both to establish a *Strickland* violation at trial and to protect the integrity of a criminal defendant's first appeal as of right, due process requires either that the state provide funds for such experts or, alternatively, that the defendant not be compelled to affirmatively establish *Strickland* prejudice. *See Case v. Nebraska*, 381 U.S. 336, 337 (1965) (leaving open the question of "whether the Fourteenth Amendment requires that the States afford state prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees").

-42-

*See Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)(due process requires that indigent defendants must be provided the "raw materials integral to the building of an effective defense" at trial, including funds for critical forensic experts). *See also Ohio Adult Parole Authority v. Woodward*, 523 U.S. 272 (1998). Because the state courts failed to provide the requested funding for forensic experts during the state post-conviction proceedings, Evans was effectively precluded from vindicating his claim that trial counsel's failure to conduct a forensic investigation had actually prejudiced him. It can hardly be gainsaid that objective forensic evidence pointing to Tinsley as the shooter would have powerfully buttressed the defendants' version of events before the jury and that, but for defense counsels' failure to conduct this critical forensic investigation, there is a reasonable probability that the results of the proceedings would have been different. *See Strickland*, 466 U.S. 668.

Whether prejudice should be presumed, or whether the SJC's finding of a lack of prejudice should be held "objectively unreasonable," it is clear that Evans' rights were violated and the writ should issue.

-43-

### 3. The state court's admission of evidence from Alton Clarke and Marvette Neal, without adequate safeguards, violated Evans' confrontation rights.

#### A. Introduction.

"'[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.'" *Lee v. Illinois*, 476 U.S. 530, 540 (1986), *citing Pointer v. Texas*, 380 U.S. 400, 405 (1965). The Supreme Court has long recognized that the Confrontation Clause of the Sixth Amendment to the United States Constitution requires that criminal defendants be given "an opportunity for effective cross-examination" of witnesses against them. *E.g., Delaware v. Fensterer*, 474 U.S. 15, 20 (1985); *Nelson v. O'Neil*, 402 U.S. 622, 629 (1971); *California v. Green*, 399 U.S. 149, 159 (1970). Consistent with this rule, the Court has repeatedly held that state evidentiary rules that conflict with this fundamental right must give way to the defendant's confrontation rights under the Sixth and Fourteenth Amendments. *See, e.g., Olden v. Kentucky*, 488 U.S. 227 (1988); *Smith v. Illinois*, 390 U.S. 129 (1968); *Davis v. Alaska*, 415 U.S. 308 (1974); *Chambers v. Mississippi*, 410 U.S. 284 (1973). The state court's ruling in this case unconstitutionally permitted the Commonwealth to present evidence and testimony from Marvette Neal and

-44-

Alton Clarke without providing adequate safeguards to protect his rights under the Confrontation Clause.

B.   **The trial court's ruling precluding the defense from informing the jury that Alton Clarke was facing an aggravated rape charge with a potential life sentence violated the defendant's right to confrontation.**

Alton Clarke was the only Commonwealth witness to testify that he actually observed the shooting. It was not until approximately nine months later – after Clarke had been indicted for aggravated rape, kidnaping, and assault and battery with a dangerous weapon – that Clarke provided the police with substantive details of the incident (Tr.6/76).

In an effort to flesh out Clarke's motive to fabricate in order to curry favor with the prosecution, the defense sought to identify to the jury the specific charges pending against Clarke as well as the fact that he was facing "a potential life sentence" (Tr.6/74-76).[21] The prosecutor objected on the ground that "the nature of the charges would ... be disturbing and highly prejudicial" (Tr. 6/75). The trial judge thereupon precluded the defense from

---

[21]For the background of Clarke's pending charges, *see Commonwealth v. Clarke*, 48 Mass. App. Ct. 482 (2000) (reversing convictions on two counts of aggravated rape and one count of kidnapping at second trial, the first having ended in a mistrial), and S.C. , 60 Mass. App. Ct. 1105 (2003) (affirming convictions on two counts of aggravated rape, one count of kidnapping after third trial).

identifying the charges pending against Clarke, and instead permitted the defense only to elicit the fact that Clarke had "serious pending matters" or "felony cases" and to ask him whether he had been offered any inducements or rewards in exchange for his testimony (Tr. 6/74-76).

On appeal, Evans challenged the validity of this restriction as violative of his Sixth and Fourteenth Amendment Rights to Confrontation. The SJC rejected this constitutional challenge on the ground that this limitation on cross-examination did not unduly prevent Evans from "explor[ing] adequately the question and extent of Clarke's bias and motive to cooperate with the prosecution." *Evans*, 439 Mass. at 189.

It has long been "clearly established" that "the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986) (citations and internal quotation marks omitted).[22] Indeed, it has long been recognized that the cross-examination of

---

[22] See also *Commonwealth v. Haywood*, 377 Mass. 755, 760 (1979) ("[a] defendant has the right to bring to the jury's attention **any 'circumstance which may materially affect'** the testimony of an adverse witness which might lead the jury to find that the witness is under an 'influence to prevaricate'"), quoting *Commonwealth v. Marcellino*, 271 Mass. 325, 327 (1930) (emphasis added).

-46-

a witness with pending charges or a prior record is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska* 415 U.S. at 308, 316. Specific attacks on the peculiar biases and motivations of a witness, have been recognized as far more potent than general attacks on the witness's credibility, and have widely been understood to implicate issues of constitutional dimension. *See United States v. Abel*, 469 U.S. 45 (1984); *Davis v. Alaska*, 415 U.S. 308 (1974).[23]

"Although the trial justice retains the traditional discretion to limit the scope of cross-examination," the judge may not so restrict cross-examination as to interfere with the defendant's "constitutionally required threshold level of inquiry," *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir. 1982), but must give the accused "sufficient leeway to establish a reasonably complete picture of the witness's veracity, bias, and motivation." *United States v. Laboy-Delgado*, 84 F.3d 22, 28 (1st Cir. 1996) (internal quotation marks omitted). A criminal defendant who seeks to present the jury with evidence of a witness's motive to "cooperate with the government ... should be permitted wide latitude in the search for the witness's bias." *Tracey*, 675 F.2d at 438 (citations omitted). *See O'Brien v. DuBois*, 145 F.3d 16, 30-34 (1st

---

[23] *See also Commonwealth v. Joyce*, 382 Mass. 222 (1981).

-47-

Cir. 1998); *United States v. Abel*, 469 U.S. 45, 50 (1984) (explaining that *Davis v. Alaska* "holds that the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness").

In furtherance of this right, defendants must be afforded a full and fair opportunity to expose the nature and extent of a witness's "desire to cooperate" with the government and to show how that desire to cooperate may "cloud perception" or otherwise distort the witnesses' veracity "beneath the conscious level, in a manner not apparent even to the witness." *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980). The defendant's right to explore the sources of bias must be honored even where there are powerful countervailing interests on the part of the state or the witness. *See Davis v. Alaska*, 415 U.S. at 319 (anonymity of juvenile offenders); *Joyce*, 382 Mass. at 229 (sexual privacy). The ability to fully confront a witness and challenge his motivations, of course, assumes heightened significance where the case turns on the jury's assessment of the witnesses' credibility.

In the instant case, the trial court's ruling prevented the defendant from fully exposing the nature and extent of Clarke's potential motive to fabricate his testimony, and thereby deprived the defendant of his state and federal

-48-

constitutional right to properly confront and cross-examine Clarke. Allowing defense counsel the use of vague and technical terms, such as "serious felonies," prevented the defense from adequately exploring the risk of extraordinary stigmatization and the severe punishment that Clarke faced. The defense was thus prevented from "develop[ing]" a true understanding of the defendant's "claim of bias [by Clarke]." *Davis v. Alaska*, 415 U.S. at 318, and the jury was left without a concrete appreciation of Clarke's dilemma and of the importance to him of prosecutorial leniency.

While a trial judge in Massachusetts may restrict the use of pending charges to impeach a witness where the witness had given prior detailed statements that were consistent with the witness's trial testimony and pre-dated the new charges, *see Commonwealth v. Haywood*, 377 Mass. 755, 762-763 (1979), in the instant case, Clarke did not give any descriptions of the gunmen or their firearms that identified the defendants at the time that he placed the 911 call (Tr. 6/91, 6/149). While Clarke did give detailed descriptions of the gunmen nine months after the incident – which was at least six or seven months after he had been indicted on the aggravated rape charge (Tr.6/99-100) – at trial, Clarke explained that he was "scared for his life," that he "wasn't focusing" on the height or the clothing of the gunmen,

-49-

and that any prior descriptions would have been "speculat[ion]" (Tr.6/103). Clarke's trial testimony was far more detailed than the description he gave during his 911 call and added numerous inculpatory details, including descriptions of the firearms and the locations in the Lexus where each of the gunmen sat, that were absent during the 911 call, which gave only a description of the Lexus and its license plate number (see Tr.6/89,91,149).

Clarke's testimony was particularly harmful to the defendant in that it placed both gunmen in the front seats of the Lexus and thereby exculpated Tinsley who sat in the back. In light of the inconsistencies and anomalies plaguing the Commonwealth's case, the trial judge's severe restrictions on the defendant's ability to confront and cross-examine Clarke on the critical issue of bias could not have been harmless beyond a reasonable doubt.

C.  **The trial court's rulings permitting the Commonwealth to call Marvette Neal in order to present his prior inconsistent statements to the grand jury and his detailed statements to the police, violated Evans' right to confrontation and due process**

When called to the witness stand by the prosecution, Marvette Neal testified that he "d[id]n't remember" seeing the "Evans brothers" at Walaikum's on the night of the shooting, that he was unable to identify the shooters, and that he never identified the defendant to the police as Jackson's

-50-

assailant (Tr.4/175,181,193-195,198-199,201) Over objection, the prosecutor was allowed to introduce Neal's grand jury testimony in which he claimed to have seen Evans and his brother inside Cortee's and Walaikum's on the night of the shooting (Tr.4/177-180,184-185). The prosecution was also allowed to introduce the testimony of Detective Kenneth Dorch that, about three weeks after the shooting, Neal made a detailed statement about the shooting in which he identified Evans and his brother as the shooters (Tr.5/13-17, 31). Dorch also testified that Neal made a photo identification of Evans and his brother as the shooters (Tr.5/20).

On appeal, Evans argued that the introduction of Neal's grand jury testimony and Dorch's testimony regarding Neal's alleged statements violated Evans' confrontation rights under the state and federal constitutions. The Supreme Judicial Court acknowledged that the admission of the grand jury testimony was erroneous under Massachusetts evidentiary law[24] but did not rule on whether its admission violated Evans' constitutional right to confront witnesses against him. *Evans,* 439 Mass. at 190-191. The court also concluded that Dorch's testimony was properly admitted for impeachment

---

[24] The court then went on to conclude that the grand jury testimony was "merely cumulative of other testimony" and therefore not prejudicial. *Evans,* 439 Mass. at 191.

-51-

purposes under Massachusetts evidentiary law but again did not rule on whether its admission violated Evans' confrontation rights. *Evans*, 439 Mass. at 192. Because Evans timely presented his Confrontation Clause claim to the state appellate court and that court left the issue unresolved, this Court must not apply AEDPA's "strict standards" but, instead, must examine the claim de novo. *Horton*, 370 F.3d at 80.

Defendants in criminal cases must be given "an opportunity for effective cross-examination" of adverse witnesses. *Festered*, 474 U.S. at 20. Because Neal could not remember the substantive facts contained in his grand jury testimony and in his alleged statement to the police—that he had seen Evans inside the restaurant the night of the shooting and had actually seen him shoot at the victim—or even that he had given this testimony or made this statement, Evans was denied an opportunity to mount an effective cross-examination.

This case presents a very different situation than that presented in *United States v. Owens*, 484 U.S. 554 (1988). There, the Supreme Court held that there was no Confrontation Clause violation where a prison employee who had been severely beaten by an inmate testified that, because of the injuries sustained during the beating, he could not remember who assaulted

-52-

him but could remember that he had earlier told the police that it was the defendant. *Id.* at 560. The Court based its holding on the fact that the defendant had the opportunity to mount an effective cross-examination of the witness. *Id.* at 559. In this case, by contrast, the petitioner had no such opportunity to conduct an effective cross-examination of Neal. Because Neal could not remember his testimony before the grand jury and denied making the statement to the police, Evans could not bring out such fundamental matters as whether he had been untruthful or had a bias when he testified and gave his statement, and the petitioner was unable to ask Neal to clarify his testimony. "The purpose of protecting the right to cross-examine is to afford the defendant an opportunity to impeach the credibility of a witness and to explore the witness' motives and biases." *United States v. Arias-Santana*, 964 F.2d 1262, 1267 (1992) (citation and internal quotation marks omitted). Evans clearly had no such opportunity.

In *Owens*, the witness's testimony boiled down to the following statement: "'I don't know whether this is the man who assaulted me, but I told the police I believed so earlier.'" *Owens*, 484 U.S. at 560. Here, however, the damning statements from Neal came in not through his in-court testimony—which was in no way helpful to the prosecution— but, rather,

-53-

through out-of-court statements that remained untested by cross-examination. This the Sixth Amendment cannot tolerate. *See United States v. Vargas*, 933 F.2d 701, 705 (1991) (distinguishing *Owens* from a case where the court did not allow defense counsel to ask if the witness's "memory was better during his present testimony or during earlier questioning . . . [or] if he admitted giving the prior testimony").

Given the critical importance of Clarke's testimony, and given the equally toxic admission of Marvette Neal's evidence that likely bolstered Clarke's testimony, the trial court's ruling amounted to a clear-cut violation of the Supreme Court's holding in *Davis*. Under the circumstances, the SJC's determination that Evans' right to confrontation was not violated constituted a plainly unreasonable application of clearly established federal law.

4. **The Massachusetts SJC's Reliance on "Facts the Jury Could Have Found" Was an Erroneous Application of *Jackson v. Virginia*'s Standard of Review Outside of the Insufficiency of Evidence Context.**

The SJC committed a fundamental conceptual error by basing its decision denying Evans' ineffective assistance of counsel and confrontation clause claims on a summary of the facts "[t]he jury could have found," *Evans*, 439 Mass. at 186, rather than on the totality of the evidence presented at trial.

The court's summary patched together the most damning evidence against Evans, while ignoring the many inconsistencies and anomalies in the testimony of prosecution witnesses and overlooking exculpatory evidence introduced by the defense at trial. *See id.* 186-188. Building on this factual summary, the court also analyzed Evans' ineffective assistance of counsel claim by looking at the evidence only from the Commonwealth's perspective. The court again looked at the evidence exclusively from the prosecution's perspective when determining whether the erroneous admission of the grand jury testimony was harmless error. By "viewing the evidence in the light most favorable to the prosecution," *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the SJC effectively adopted the standard for evaluating constitutional insufficiency-of-evidence claims and misapplied it outside that limited context. This decision ignored the clear directives of the Supreme Court in *Strickland* and *Chapman* and therefore was contrary to clearly established federal law.

### A. The SJC Failed to Apply *Strickland v. Washington's* Standard for Determining Prejudice.

While the SJC's method of evaluating the trial evidence would have been appropriate had petitioner challenged the legal sufficiency of evidence,

-55-

*Jackson*, 443 U.S. at 318-319, its use when evaluating a claim of ineffective assistance of counsel was in direct conflict with Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984). The standard set forth in *Jackson* is applicable only where a defendant challenges his or her conviction on the ground that it was not supported by sufficient evidence for a rational trier of fact to have found guilt beyond a reasonable doubt. In those cases, the reviewing court must consider "the evidence in the light most favorable to the prosecution" and then determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

The standard set forth in *Strickland* for determining prejudice in relation to ineffective assistance of counsel claims, however, differs radically from the standard articulated in *Jackson*. In *Strickland*, the Court set forth the now-familiar two-part test that defendants must satisfy when claiming ineffective assistance of counsel. First, they must establish that "counsel's performance was deficient." Second, they must establish that counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. With respect to the prejudice prong, defendants must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result

-56-

of the proceeding would have been different." *Id.* at 694. In making this determination, reviewing courts "must consider *the totality of the evidence before the judge or jury.*" *Id.* at 695 (emphasis added). This type of analysis must be undertaken because, viewed in the light of all the evidence presented at trial, some errors will "alter[] the entire evidentiary record," while others will only have "an isolated, trivial effect." *Id.* at 696. Additionally, it is important for the reviewing court to evaluate the overall strength and weakness of the prosecution's case because the question of whether counsel's errors influenced the outcome of the trial will often hinge on whether or not the evidence of guilt was overwhelming. *Id.* In sum, *Strickland* requires reviewing courts, when conducting their prejudice analysis, to consider the entire evidentiary record, including evidence both favorable and harmful to the defendant. *See Williams*, 529 U.S. at 397-398 (holding that state supreme court's analysis of ineffective assistance of counsel claim in death penalty case "was unreasonable insofar as it failed to consider the totality of the mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding–in re-weighing it against the evidence in aggravation").

By failing to consider the totality of the evidence, including evidence

-57-

favorable to Evans, the SJC's decision in this case conflicted directly with *Strickland* and was therefore contrary to clearly established federal law. Evans argued that his trial counsel had performed deficiently by failing to hire experts to conduct the following tests: ballistics tests on a fragment of a bullet from petitioner's gun that was found in the restaurant where the murder occurred, DNA tests on blood found on co-defendant Tinsley's coat to determine if it was Jackson's, and fingerprint tests on the firearms, including the gun purportedly connected to John Evans.

The SJC committed a fundamental conceptual error by basing its decision on a summary of the facts "[t]he jury could have found," which pulled together the evidence most harmful to Evans, while omitting all evidence helpful to him. The court's summary concealed the fact that the prosecution's case was not overwhelming. Neither Evans nor his brother was ever shown to have known Jackson or to have had any motive to shoot him. All three of the prosecution's witnesses had problems or anomalies in their testimony. Holliday, Jackson's best friend who was motivated to place blame for the killing of his best friend, did not actually see the shooting. Significantly, Holliday's testimony fingering co-defendant Robert Brown was obviously discredited by the jury when it acquitted Brown. Alton Clarke, the

-58-

only Commonwealth witness to claim he actually saw the shooting, did not give details to the police until nine months after the shooting when an aggravated rape charge was pending against him. Although Detective Dorch presented detailed statements from Marvette Neal implicating Evans and his brother, these statements were admitted for impeachment purposes only, not as substantive evidence. Neal's own trial testimony contained nothing of substance to incriminate Evans. Finally, aside from the bullet fragment found on the rug, which no defense expert ever examined, virtually all of the forensic evidence was consistent with petitioner's testimony that his gun discharged while pointing away from Jackson as he was standing at the threshold of the restaurant. None of these fundamental problems in the prosecution's case made their way into the SJC's summary or its analysis of what prejudice was caused by trial counsel's alleged deficiencies.

When conducting its prejudice analysis, the SJC found that Evans was not prejudiced by counsel's failure to arrange the ballistics tests because the fragment "had blood on it, from which the jury could infer that it was one of the bullets that passed through the victim's body." *Evans*, 439 Mass. at 201. The court again relied on this speculation about the jury's inferences when it held that the failure to test the blood on the Tinsley's jacket resulted in no

prejudice. The court concluded that "even if Tinsley had shot the victim, that would not have helped [Evans], who admitted being the one who shot the Ruger from which a bullet was fired that passed through the victim's body." *Id.* at 201. While such speculation about the jury's inferences is appropriate when the reviewing court is examining the legal sufficiency of the evidence, it is entirely inappropriate when the court is determining prejudice under *Strickland* and is required to consider the totality of the evidence.

In finding that counsel's failure to have the fingerprint testing performed had not prejudiced Evans, the court stated that "even if Tinsley had been one of the shooters, the evidence of joint venture was overwhelming." *Id.* at 202. As the jury's verdict makes clear, this statement is contrary to the evidence presented at trial. Had the evidence of joint venture been credited by the jury, it would have convicted Tinsley and Brown, as well as the Evans brothers, no matter who it believed had fired the shots that killed Jackson. *Strickland* counsels that "[i]n making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the ... jury acted according to the law." 466 U.S. at 694. The jury's verdict shows that the evidence establishing that