UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
JIMMY EVANS,                        )
                                    )
          Plaintiff,                )
                                    )
          v.                        )  CIVIL ACTION
                                    )  NO. 04-12205-WGY
MICHAEL THOMPSON,                   )
   Superintendent, MCI Shirley,     )
                                    )
          Defendant.                )
                                    )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    December 11, 2006

I.    **INTRODUCTION**

Jimmy Evans ("Evans") brings this petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254. Evans is seeking an
evidentiary hearing plus funds to pursue forensic, ballistic, and
fingerprint testing and a reversal of his convictions of first
degree murder and possession of a firearm without a license in
the Massachusetts Superior Court sitting in and for the County of
Suffolk. Petition Under 28 U.S.C. § 2254 for Writ of Habeas
Corpus by a Person in State Custody [Doc. No. 1] ("Habeas Pet.")
at 2; Petitioner's Motion for Funds & for an Evidentiary Hearing
in Support of His Petition for Writ of Habeas Corpus [Doc. No.
12] at 1. Evans' older brother John Evans ("John") was also

convicted of first degree murder for his involvement in the same incident. <u>Commonwealth</u> v. <u>Evans</u>, 439 Mass. 184, 186 (2003).

Evans bases his request for relief on four principal arguments: (1) the unconstitutionality of 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"); (2) the alleged application of improper standards by the Massachusetts Supreme Judicial Court ("Supreme Judicial Court") in determining the facts upon which its legal analysis was grounded; (3) ineffective assistance of counsel at trial; and (4) violation of federal constitutional due process rights due to the inability to confront two Commonwealth witnesses. Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 [Doc. No. 2] ("Pet. Mem.") at 1-2.

In response, the Commonwealth asserts that one of Evans' claims regarding the confrontation of a witness at trial was not properly presented to the Supreme Judicial Court and is therefore not exhausted. Respondent's Memorandum in Opposition to Petition for Habeas Corpus [Doc. No. 7] ("Resp. Mem.") at 1. As a result, the petition must be denied. <u>Id.</u> In the alternative, if this Court reaches the merits of the claims, the Commonwealth argues that Evans cannot show that the state court's decision was contrary to or presents an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the record evidence. <u>Id.</u>

## II.  FACTUAL[1] AND PROCEDURAL HISTORY

At about midnight on January 24, 1995, the victim, Lyle Jackson ("Jackson"), went to Cortee's Lounge, a nightclub in Dorchester, where he met his friend, Marcello Holliday ("Holliday"). <u>Evans</u>, 439 Mass. at 186-87. Evans, John, Brown, and Tinsley were also at Cortee's Lounge. <u>Id.</u> at 187. When Cortee's closed at approximately 1:45 AM on January 25, Holliday left with Jackson and another friend, and entered a car which was parked directly across the street from Cortee's. <u>Id.</u> Before driving away, John ran past their car and fired a handgun at a group of people across the street. <u>Id.</u>

Jackson, Holliday, and their friend then drove to Walaikum's, a small fast food restaurant that was crowded with customers when they arrived at approximately 2:20 AM. <u>Id.</u> About fifteen minutes later, Evans and John entered the restaurant, looked around, and then walked out. <u>Id.</u> Less than one minute later, they reentered and Evans produced a silver handgun with a black handle. <u>Evans</u>, 439 Mass. at 187. With John beside him, Evans walked toward Jackson, who, seeing him approach with the

---

[1] The description of the facts is based on the state court findings, which are presumed to be correct. <u>See</u> 28 U.S.C. § 2254(e)(1). It ought be noted that Robert Brown ("Brown") and Ronald Tinsley ("Tinsley") also were indicted for involvement in the murder. Since these two individuals were acquitted, the jury could not have found that they participated in a joint venture. See <u>infra</u> Part D for a more detailed discussion of the Supreme Judicial Court's discussion of the facts.

3

gun, began to back away. Id. At this point Holliday, who was sitting close by, ran out of the restaurant. Id. As he backed away, Jackson fell over some tables and chairs and begged Evans to spare his life. Id. Evans shot the victim four or five times. Id.

Alton Clarke ("Clarke"), a patron of the restaurant, witnessed the murder. Id. During the shooting, Clarke tried to leave the restaurant, but was confronted by John, who was armed with a black handgun. Evans, 439 Mass. at 187. John allowed Clarke to leave after Clarke stated that he had nothing to do with Jackson. Id. John then approached Jackson and fired a shot at him. Id. Clarke heard this shot as he was fleeing the restaurant. Id. Willy Wiggins, who owned Walaikum's, saw the first gunman shooting Jackson and ran to the back of the kitchen to call the police. Id.

Evans, John, Brown, and Tinsley left the scene in a gold Lexus automobile. Id. John was the driver of the Lexus, Evans was in the front passenger seat, and the other two sat in the back. Evans, 439 Mass. at 187. Clarke recorded the plate number, gave it to a security guard, and also called 911 on his cellular telephone. Superior Court Memorandum of Decision and Order on Defendants' Motions for New Trial ("Super. Ct. Mem.") at 4 (December 30, 1999) (Donovan, J.) in Petitioner's Appendix B of Pet. Mem. at 33a. Holliday saw the gold Lexus flee the scene,

identified John as the driver, and noticed three other passengers in the car. Id. at 2-3. Back at the restaurant, Holliday found Jackson lying on the floor, spitting up blood and attempting to talk. Id. at 3. Holliday and Marvette Neal ("Neal") attempted to comfort Jackson while medical personnel arrived. Id.

The police arrived on the scene and pursued the gold Lexus automobile. Evans, 439 Mass. at 187. During the ensuing chase, two guns were thrown out of the front passenger window of the Lexus. Id. at 187-88. The Lexus stopped at a dead end street and the occupants got out and fled on foot. Id. at 188. All four were ultimately apprehended and the two guns thrown from the Lexus were recovered. Id. One of the guns was a silver-plated nine millimeter Ruger semiautomatic handgun with a black handle. Id. The other gun was a black nine millimeter Heckler & Koch semiautomatic handgun. Id. Six shell casings (three from each gun) and four bullet fragments (two from each gun) were recovered from inside and outside the restaurant. Evans, 439 Mass. at 188. One of the bullet fragments removed from Jackson's body matched the black Heckler & Koch. Id. No identifiable fingerprints could be retrieved from either gun. Id.

Jackson was shot three times and he died from an infection due to his wounds. Id. One bullet passed through his left forearm and reentered his left chest. Id. This bullet was recovered by the medical examiner. Super. Ct. Mem. at 3. The two other bullets

5

entered near the left rib cage, traveled through the body, and exited the right side of his abdomen. Id.

On February 21, 1995, Evans was indicted and charged with first degree murder, two counts of illegally possessing ammunition, and two counts of illegally possessing a firearm. Pet. Mem. at 2. Evans, John, Brown, and Tinsley were tried on a theory of joint venture. Evans, 439 Mass. at 188. On November 8, 1996, after a jury trial in Suffolk County Superior Court, Evans was convicted on all counts and sentenced to life without parole on the murder conviction and concurrent terms of five years on the two firearm charges. Resp. Mem. at 2. The remaining ammunition convictions were placed on file with the petitioner's consent. Id. John was also convicted of first degree murder as well as related charges. Pet. Mem. at 3. The two other co-defendants, Brown and Tinsley, were acquitted. Evans, 439 Mass. at 188.

On November 17, 1998, Evans filed a motion for a new trial. Resp. Mem. at 2. After two non-evidentiary hearings, Justice Elizabeth Donovan of the Superior Court denied the motion in a written memorandum and order on December 30, 1999. Super. Ct. Mem. at 1, 27. Evans filed a timely notice of appeal from the denial of his motion for a new trial. Resp. Mem. at 2. This appeal was consolidated with his direct appeal to the Supreme

Judicial Court, filed pursuant to Massachusetts General Laws chapter 278, section 33E. Id.

On April 16, 2003, the Supreme Judicial Court affirmed Evans' conviction and upheld the denial of his post-conviction motions. Evans, 439 Mass. at 205. A petition for rehearing was denied on June 5, 2003. Resp. Mem. at 3. On October 20, 2003, the United States Supreme Court denied Evans' petition for writ of certiorari. Evans v. Massachusetts, 540 U.S. 973 (2003).

Evans filed a petition for writ of habeas corpus and supporting memorandum in this Court on October 19, 2004. Habeas Pet. at 1.

## III. DISCUSSION

### A.    Standard of Review

Habeas corpus review of claims previously adjudicated in state court is both limited and highly deferential:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which vests "primary responsibility" for evaluating federal law claims raised in criminal trials in the state courts. Woodford v. Visciotti, 537 U.S. 19, 24, 27 (2002) (per curiam) (citing Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997)). State courts are presumed to know and follow federal law. Id. at 24. Under current Supreme Court precedent, habeas relief is not warranted if the state court's decision was merely erroneous or incorrect. Id. at 27; Williams v. Taylor, 529 U.S. 362, 412-13 (2000). It is not even sufficient that the state court "failed to apply" clearly established Supreme Court law, Early v. Packer, 537 U.S. 3, 10-11 (2002) (per curiam), or that the state court committed "clear error," Lockyer v. Andrade, 538 U.S. 63, 75 (2003), or that the reviewing court is of the "firm conviction" that the state court's ruling was erroneous, id. at 75-76.

    Rather, federal courts must not disturb state court judgments unless the petitioner demonstrates that his claim falls into one of the narrow categories set forth in the statute. See 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently

than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13. The analysis under the "unreasonable application" clause makes relief available only if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. The application of a legal rule will be deemed unreasonable if there is "some increment of incorrectness beyond error" that is "great enough to make the decision unreasonable in the independent objective judgment of the federal court." <u>Norton</u> v. <u>Spencer</u>, 351 F.3d 1, 8 (1st Cir. 2003) (quoting <u>Francis S.</u> v. <u>Stone</u>, 221 F.3d 100, 111 (2d. Cir. 2000) and <u>McCambridge</u> v. <u>Hall</u>, 303 F.3d 24, 36 (1st Cir. 2002))

The clearly established law that is relevant to the analysis under 28 U.S.C. § 2254(d)(1) is limited to the holdings of Supreme Court cases extant at the time of the state court decision, and it does not include dicta in such cases. <u>Williams</u>, 529 U.S. at 412.

**B. The Constitutional Challenge - The Great Writ**

The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

U.S. CONST. Art. I, § 9. So is "the Great Writ of Habeas Corpus established in clause 39 of Magna Carta (1215) [] enshrined in our own United States Constitution." <u>Enwonwu</u> v. <u>Chertoff</u>, 376 F.

Supp. 2d 42, 42 (D. Mass. 2005), *aff'd in part and rev'd in part on other grounds*, 438 F.3d 22 (1st Cir. 2006). Since the Writ is an aspect of the matters expressly delegated by the Constitution to the legislature, the Supreme Court has repeatedly recognized that judgments about its proper scope are "normally for Congress to make." Lonchar v. Thomas, 517 U.S. 314, 323 (1996). See AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY, 121-22 (2005).

In recent years, successive Congresses have expressed their displeasure with the courts by consistently narrowing the protections of the Writ and stripping the courts of their jurisdiction to entertain habeas issues. AEDPA is only one of a number of such legislative rebukes. See Gonzalez v. United States, 135 F. Supp. 2d 112, 115 n.5 (D. Mass. 2001) (recognizing AEDPA is "jurisdiction stripping" legislation). To like effect, see the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (codified in scattered sections of the U.S.C.), providing "[n]otwithstanding any other provision of law . . . , no court shall have jurisdiction to review" certain orders affecting aliens. 8 U.S.C. § 1252(a)(2)(C) (Supp. II 1996). See Ernest A. Young, *Constitutional Avoidance, Resistance Norms, and the Preservation of Judicial Review*, 78 TEX. L. REV. 1549, 1553, 1567 (2000) (recognizing IIRIRA is "jurisdiction-stripping" legislation); Note, *Powers of Congress and the Court Regarding*

*the Availability and Scope of Review*, 114 HARV. L. REV. 1551,
1552-53 (2001) ("Courts . . . struggle[] to construe IIRIRA
narrowly in order to avoid deciding the constitutional questions
posed by such congressional attempts to limit the availability of
judicial review.").

More recently, Congress enacted the Real ID Act of 2005,
Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302, stripping the
district courts of habeas jurisdiction over alien removal
orders.[2] See Enwonwu, 376 F. Supp. 2d at 84-85 (pointing out
that, where the right to a jury trial attaches, such ouster of
jurisdiction is difficult if not impossible and the American jury
thus serves as a prime guarantor of the separation of powers and
judicial independence). Most recently, the Supreme Court declared
that our captives in Guantanamo, some of whom apparently have
been the victims of torture,[3] may avail themselves of the
privilege of habeas corpus, Hamdan v. Rumsfeld, 548 U.S. __, 126
S. Ct. 2749, 2764 (2006),[4] and Congress promptly suspended the

---

[2] Congress intended this law immediately to oust the
district courts of jurisdiction over pending proceedings, thus
wasting approximately $25,000,000 in public monies. Enwonwu, 376
F. Supp. 2d at 84.

[3] See Khan v. Bush, 1:06-CV-01690 (D. D.C. Sept. 29, 2006)
(Walton, J.); see also Andrew Cohen, *Feds Want to Keep Torture a
Secret* (CBS special report Nov. 14, 2006), *available at*
http://www.cbsnews.com/stories/2006/11/14/opinion/courtwatch/main
2180095.shtml.

[4] It would be difficult to overstate the moral force of the
Hamdan decision (or the need for the Great Writ):

_____

[O]n June 29, 2006. . . . the [Supreme] Court said
something profound about America. A man with a
fourth-grade education from Yemen, accused of
conspiring with one of the world's most evil men, sued
the most powerful man in the nation (if not the world),
took his case to the highest court in the land, and
won. The Court's profound commitment to the rule of law
is a beacon for other countries around the world. In no
other country would such a thing be possible.

The *Hamdan* decision reflects the genuine promise
of America--a promise embodied in the words of Justice
Rutledge, dissenting in the last great military
commission case, *In re Yamashita* [327 U.S. 1 (1967)]:

> More is at stake than General
> Yamashita's fate. There could be no possible
> sympathy for him if he is guilty of the
> atrocities for which his death is sought. But
> there can be and should be justice
> administered according to law. In this stage
> of war's aftermath it is too early for
> Lincoln's great spirit, best lighted in the
> second inaugural, to have wide hold for the
> treatment of foes. It is not too early, it is
> never too early, for the nation steadfastly
> to follow its great constitutional
> traditions, none older or more universally
> protective against unbridled power than due
> process of law in the trial and punishment of
> men, that is, of all men, whether citizens,
> aliens, alien enemies or enemy belligerents.
> It can become too late.
> This long-held attachment marks the
> great divide between our enemies and
> ourselves. Theirs was a philosophy of
> universal force. Ours is one of universal
> law, albeit imperfectly made flesh of our
> system and so dwelling among us. Every
> departure weakens the tradition, whether it
> touches the high or the low, the powerful or
> the weak, the triumphant or the conquered.
> [*Id.* at 41-42 (Rutledge, J., dissenting)]

In 1956, a young former law clerk to Justice
Rutledge quoted these very words in a book chapter
about his former boss. [John Paul Stevens, *Mr. Justice*

Writ as to these captives and ousted all the courts from
affording collateral judicial review. Military Commissions Act of
2006, Pub. L. No. 109-366, 120 Stat. 2600, 2623-24. All this is
well known and the subject of public debate. See, e.g., 152 Cong.
Rec. H7508-60 (daily ed. Sept. 27, 2006) (statements of Rep.
Markey, Rep. Cole, Rep. Slaughter, Rep. Dreier, Rep. Hastings,
Rep. Miller, Rep. Matsui, Rep. Lungren, Rep. Skelton, Rep.
Hunter, Rep. Tauscher, Rep. Gingrey, Rep. Pelosi, Rep. Diaz-
Balart, Rep. McGovern, Rep. Gohmert, & Rep. Jackson-Lee); 152
Cong. Rec. S10354-431 (daily ed. Sept. 28, 2006) (statements of
Sen. Kyl, Sen. Specter, Sen. Leahy, Sen. Sessions, Sen. Feingold,
Sen. Cornyn, Sen. Bond, Sen. Feinstein, Sen. Smith, Sen. Levin,

---

     *Rutledge*, *in* MR. JUSTICE 177, 199-200 (Allison Dunham &
Philip B. Kurland eds., 1956)]. His name was John Paul
Stevens. And exactly fifty years later, he made good on
Justice Rutledge's promise.
     In due course, each of us will be called upon to
make Justice Rutledge's promise more of a reality. . .
. Courts can continue the *Hamdan* tradition of carefully
scrutinizing executive branch claims of speed and
dispatch and policing treaty interpretations that go
beyond the pale. The President and Congress both must
come to realize that the Constitution is our most
sacred document, not a document of convenience. It
demands hard study and faithful adherence to its text,
purpose, and structure. Neither the Court nor those who
stand up for these basic rights should be accused of
"coddling terrorists." In fact, there is no tradition
more central to the American experiment, or more
critical to its continuing power to inspire.

Neal Kumar Katyal, *Comment:* Hamdan v. Rumsfeld: *The Legal Academy
Goes to Practice*, 120 HARV. L. REV. 65, 122-23 (2006).

Sen. Byrd, Sen. Reid, & Sen. Graham); Editorial, *Letters to the
Editor: Fear Alters Meaning of Democracy in U.S.*, Columbus
Dispatch, Nov. 26, 2006, at 4B; Editorial, *Terror Detainees Still
Face Legal Limbo*, Denv. Post, Nov. 22, 2006, at B6; Talbot
"Sandy" D'Alemberte, *The Golden Rule of International Human
Rights*, Orlando Sentinel, Nov. 22, 2006, at A15; Linda Allewalt,
Op-Ed., *Recapturing Individual Liberty*, Courier-Journal
(Louisville, KY), Nov. 20, 2006, at 7A; Larry P. Goodson, *Winning
the Battles but Losing the War?: To Beat the Terrorists, America
Needs to Use Ideas, Images as Well as Weapons*, Baltimore Sun,
Nov. 19, 2006, at 1F; Editorial, *Job No. 1 for Congress:
Restoring Rights*, Wash. Post, Nov. 17, 2006, at A24; Scott
Holcomb & Mark Ribbing, *War Has Changed: The Laws of War Must,
Too*, Christian Sci. Monitor, Nov. 16, 2006, at 9; Editorial, *Spin
and Consequences*, N.Y. Times, Nov. 15, 2006, at A26; Carol
Rosenberg, *Lawsuit Casts Rumsfeld as War Criminal*, Seattle Times,
Nov. 15, 2006, at A10; Editorial, *Careless Congress: Lawmakers
Passed a Detainee Law of Doubtful Constitutionality. Now They
Expect the Courts to Clean It Up*, L.A. Times, Nov. 3, 2006, at
A28; Jonathan S. Landay, *VP Confirms Use of Waterboarding*, Chi.
Trib., Oct. 27, 2006, at C5; Editorial, *From Our Readers:
Tortured Constitution*, Detroit Free Press, Oct. 20, 2006, at 14;
Erwin Chemerinsky, *Will the Courts Uphold the Constitution?*, San
Diego Union-Trib., Oct. 20, 2006, at B7; Gabriella Blum & Martha

Minow, Op-Ed., *The Israeli Model for Detainee Rights*, Boston Globe, Oct. 18, 2006, at A9.[5]

---

[5] Using extensive polling data, Frederick Schauer demonstrates convincingly that during the entire 2005 Supreme Court term, "not much besides *Hamdan* was particularly salient to the public or to its elected representatives." Frederick Schauer, *Foreword: The Court's Agenda–And the Nation's*, 120 HARV. L. REV. 5, 64 (2006).

Polling, however sophisticated, is, of course, only sampling. Assuming most people today receive their news over the internet, the following provides a look at actual web usage over time on the day the Supreme Court issued the <u>Hamdan</u> decision (June 29, 2006) and on the day Congress nullified it with the Military Commissions Act (The President signed the legislation on October 19, 2006).



**June 28-29, 2006 (Global View)**



**October 16-19, 2006 (North America View)**

What is not so well known is the fact that the Supreme Court itself is hostile to lower court habeas litigation.  Vicki C. Jackson, *Seductions of Coherence, State Sovereign Immunity, and*

---

Akamai Net Usage Index: News: http://www.akamai.com/html/technology/nui/news/index.html (last visited Nov. 29, 2006).  The generalized wave form is normal.  It reflects North American web usage and sleep patterns as North America is by far the greatest user of the internet.  It is the spikes that are significant.  A knowledgeable interpreter reads the data this way:

> June was a big month for Web traffic, with World Cup soccer driving most of the attention.  Significant dates in June were:
>> June 12th – US played Czech Republic in 1st Round of World Cup resulting in peak of 4,733,201 visitors per minute, occurring at 2 p.m.
>> June 22nd – US was eliminated by Ghana at 12 p.m. (noon), resulting in largest traffic spike to date recorded by our index of 7,283,584 v/min. . . .
>
> [O]n the 29th, there is some "peakiness" around 10 a.m. ET and 2 p.m. ET, but nothing discernable. Comparatively, it was a fairly standard day.
>
> During [the October 16-19] timeframe [sic], escalating violence in Iraq had dominated the news, as well as the U.S. confirming No. Korea's nuclear testing. The individual spike late on the 16th had to do with Monday Night Football. The morning of the 16th also received high traffic following an earthquake in Hawaii. The 17th was certainly higher than normal, but hard to decipher a particular event. Oct. 19th peaked around violence in Iraq (we believe). Not on here, but of note . . . the Cory Lidle plane crash was October's largest traffic day (10/11), recording 4,598,917 visitors/minute at 2:45 p.m.

E-mail from Jeffrey W. Young, Akamai, to Marie Bell, Judicial Assistant (Nov. 29, 2006) (on file in chambers).

It appears clearly that matters affecting their Constitution do not immediately register on the consciousness of the American people.  Not even a blip.

*the Denationalization of Federal Law*, 31 RUTGERS L.J. 691, 707-08

(2000). Indeed, it is hostile to lower court litigation

generally. Andrew M. Siegel, *The Court Against the Courts:*

*Hostility to Litigation as an Organizing Theme in the Rehnquist*

*Court's Jurisprudence*, 84 TEX. L. REV. 1097, 1117 n.67 (2006)[6]

---

[6] This brilliant, detailed, and comprehensively researched
article deserves a wider audience. It provides a partial answer
to one of the most pressing issues of our time.

> The American Jury system is withering away. This is the
> most profound change in our jurisprudence in the history
> of the Republic. As district judges, we ought be in the
> forefront of a national debate concerning this matter. We
> are not. In fact, we operate as though we don't much
> care.

William G. Young, An Open Letter to U.S. District Judges, 50 The
Federal Lawyer 30, 30 (July 2003) [hereinafter Open Letter]. See
Kirk W. Schuler, Note, *ADR's Biggest Compromise*, 54 DRAKE L. REV.
751, 758-64, 766-69, 781-89 (2006) (endorsing this thesis). In
fact, "[m]any judges . . . do not like the very processes of
adjudication with which they work on a daily basis." Judith
Resnik, *For Owen M. Fiss: Some Reflections on the Triumph and the
Death of Adjudication*, 58 U. MIAMI L. REV. 173, 193 (2003). If the
Supreme Court itself is hostile to litigation and is, to use
Professor Marc Galanter's phrase, "turn[ing] against [the] law,"
Marc Galanter, *The Turn Against Law: The Recoil Against Expanding
Accountability*, 81 Tex. L. Rev. 285, 285 (2002), then it is not
surprising that we inferior courts "have lost focus on our prime
mission." Open Letter at 30. For a classic example, consider the
fact that, while the Case Administration Court Management
Committee of the United States Judicial Conference keeps an
internal list rating the efficiency of each of the nation's
ninety-four district courts, that ranking has nothing to do with
trials completed, the time from filing to trial, or the hours
spent on the bench by judges presiding over trials or trial
related matters.

This policy choice is not without its consequences. Today,
our trial courts' "status as the grassroots guardians of
constitutional values is threatened as never before." Id. Indeed,
"the eclipse of fact finding foreshadows the twilight of judicial

("the [Supreme] Court has validated or created innumerable
procedural obstacles that habeas petitioners must scale before
bringing the merits of their claims to the attention of the
federal courts"). See, e.g., Teague v. Lane, 489 U.S. 288 (1989)
(restricting the availability of the writ by holding that habeas
petitioners generally may only assert rights that existed as of
the time of their conviction); see also McCleskey v. Zant, 499
U.S. 469, 493 (1991) (replacing "deliberate bypass" standard for
successive habeas petitioners with stricter "cause and prejudice"
standard).  The Supreme Court has expressly held that Teague
analysis is required under AEDPA. Horn v. Banks, 536 U.S. 266,
272 (2002) (per curiam).

        AEDPA states that the filing of a successive petition
requires pre-approval from the appropriate circuit court of
appeals, 28 U.S.C. § 2244(b)(3)(A), and the Supreme Court has

_____

independence." DeLaventura v. Columbia Acorn Trust, 417 F. Supp.
2d 147, 154 n.7 (D. Mass. 2006). The connection between the
marginalization of our trial processes and the diminution in the
independence of a fair and impartial judiciary is more thoroughly
explored in William G. Young, *Vanishing Trials, Vanishing Juries,
Vanishing Constitution*, 40 Suffolk U. L. Rev. -- (forthcoming
Feb. 2007).

        There is one bright spot. An extraordinarily narrow majority
of the Supreme Court appears ready to resist the functional
removal of the American jury from the criminal justice system.
Blakely v. Washington, 542 U.S. 296, 303 (2004) (Scalia, J.);
United States v. Booker, 543 U.S. 220, 230 (2005) (Stevens, J.).
But see Booker, 543 U.S. at 247-48 (Breyer, J.). Whether these
decisions reflect a renewal of interest in our trial processes,
or whether this concern for the jury will be nipped in the bud
remains to be seen.

upheld the constitutionality of this restriction on successive habeas petitions. Felker v. Turpin, 518 U.S. 651, 664 (1996). Moreover, the grant or denial of this application for pre-approval "shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E). Emphasizing Congress' broad authority to regulate the scope of the writ, the Supreme Court upheld the constitutionality of the AEDPA's preclusion of Supreme Court jurisdiction. Felker, 518 U.S. at 658, 663. See generally Erwin Chemerinsky, Federal Jurisdiction 171-72 (4th ed. 2003).

Additionally, the Supreme Court recently strengthened the effect of AEDPA's one year statute of limitations for the filing of habeas corpus petitions. See 28 U.S.C. § 2244(d)(1); Mayle v. Felix, -- U.S. --, 125 S. Ct. 2562, 2574-75 (2005). It did so, however, by restricting the ability of habeas petitioners to amend and add claims to a timely-filed petition. See Mayle, 125 S. Ct. at 2574-75. In Mayle v. Felix, the Supreme Court addressed a circuit split on the proper test to analyze amendments to habeas petitions under Federal Rule of Civil Procedure 15(c).[7] See id. at 2570; Ellzey v. United States, 324 F.3d 521, 526 (7th Cir. 2003); United States v. Espinoza-Saenz,

---

[7] The Federal Rules of Civil Procedure apply to habeas petitions because habeas is, technically, a civil proceeding that collaterally attacks a criminal proceeding. Fed. R. Civ. P. 81(a)(2); Fisher v. Baker, 203 U.S. 174, 181 (1906) (characterizing habeas corpus proceedings as civil in nature).

235 F.3d 501, 504-05 (10th Cir. 2000).  Rule 15(c) allows amended claims to "relate back" to an original, timely-filed pleading if they "arose out of the [same] conduct, transaction, or occurrence."  Fed. R. Civ. P. 15(c).  This necessarily poses a problem in the context of a habeas petition, since the "conduct, transaction, or occurrence" involved in a collateral attack is by definition and application the constitutionality of the proceedings of the trial itself.  See Harris v. Nelson, 394 U.S. 286, 290-91 (1969) (describing habeas corpus as "the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action" and noting that it has the "scope and flexibility . . . to reach all manner of illegal detention [and] . . . to cut through barriers of form and procedural mazes.") The Supreme Court has now rejected this view, breaking down the underlying trial into "essential predicate[s]" for the purposes of amendments to habeas petitions, despite the inconsistency between that approach and the purpose of a habeas petition.  See Mayle, 125 S. Ct. at 2564-65 (indirectly comparing a habeas petition to "run-of-the-mine civil proceedings"); Martin v. Hubbard, 2006 WL 2073152, *1 (9th Cir. July 26, 2006) (applying Mayle to hold that the essential predicate of the amended claim was an interrogation, a tape of which was introduced at trial). The net effect is further to limit the claims that may be properly brought before a court in a habeas petition.

20

In sum, the Great Writ is great no longer.

Evans challenges the constitutionality of AEDPA's habeas corpus provisions, claiming that the statute's restrictions constitute a suspension of the writ, substitute a new remedial regime that differs from United States Constitution, Article I, section 9, clause 2 and also violates the Due Process Clause by failing to protect the freedom from bodily constraint. Pet. Mem. at 28. Evans also claims that "Article III prohibits federal court deference to state court rulings on interpreting and applying federal law." Id. These challenges are presented as "distinct, though related, reasons." Id. Bereft of controlling authority or persuasive argumentation, Evans' constitutional challenges are foredoomed to failure.

AEDPA does not constitute a suspension of the writ. See Felker, 518 U.S. at 664. Cf. Lindh, 521 U.S. at 344-45 (applying restrictions on scope of habeas to pending cases). Furthermore, broad congressional authority to define the scope of the writ defeats the argument that AEDPA is a new remedial regime that fundamentally differs from the writ enshrined in Article I of the Constitution. See Felker, 518 U.S. at 664.

Evans' final argument that AEDPA violates Article III because it requires federal court deference to state court rulings interpreting federal law is deeply flawed.  Article III is not self-effectuating, and therefore state courts are

obligated to apply and enforce federal law.  See Printz v. United States, 521 U.S. 898, 907 (1997) (describing how the Madisonian Compromise made creation of the lower federal courts optional for Congress); Testa v. Katt, 330 U.S. 386, 389-90 (1947) (reasoning that state courts are bound to apply federal law and holding otherwise "flies in the face of the fact that the States of the Union constitute a nation"); Palmore v. United States, 411 U.S. 389, 400-01 (1973) (stating that before Congress granted federal question jurisdiction to the federal courts, "state courts provided the only forum for vindicating many important federal claims.").

In the context of habeas corpus, the Supreme Court has made it clear that state courts should have the first opportunity to correct constitutional errors made in their proceedings.  Rose v. Lundy, 455 U.S. 509, 518 (1982).  Deference to state court rulings on federal law is therefore appropriate.  See id. ("[I]t would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.").

The following words from Justice Ginsburg, dissenting in Bush v. Gore, are particularly relevant and insightful:

> And not uncommonly, we let stand state-court interpretations of *federal* law with which we might disagree. Notably, in the habeas context, the Court adheres to the view that "there is 'no intrinsic reason

why the fact that a man is a federal judge should make
him more competent, or conscientious, or learned with
respect to [federal law] than his neighbor in the state
courthouse.'" [citations omitted].

531 U.S. 98, 136-137 (2000) (Ginsburg, J., dissenting). For all
of the above-stated reasons, Evans has failed to convince this
Court that the relevant habeas corpus provisions of the AEDPA are
unconstitutional.

C.   **Exhaustion of Federal Claim in State Court**

The Commonwealth asserts that Evans' Claim 3(c) is not
exhausted. Resp. Mem. at 11-12. Claim 3(c) alleges that the
admission at trial of Marvette Neal's prior inconsistent
statements to the grand jury and detailed statements to the
police amounted to a violation of Evans' right to confrontation
and due process. Pet. Mem. at 50-52. In general, a federal court
will not entertain an application for habeas relief unless the
petitioner fully has exhausted his state remedies with respect to
every claim contained in the petition. Rose, 455 U.S. at 518-19.

AEDPA states that "[a]n application for a writ of habeas
corpus on behalf of a person in custody pursuant to the judgment
of a State court shall not be granted unless it appears that . .
. the applicant has exhausted the remedies available in the
courts of the state." 28 U.S.C. § 2254(b)(1). The Supreme Court
has held that the "federal claim must be fairly presented to the
state courts." Picard v. Connor, 404 U.S. 270, 275 (1971).  To
determine whether a habeas petitioner fairly presented this

23

claim, a federal court in a habeas proceeding must examine the state court records, id. at 276, and review the exhaustion issue de novo. Barresi v. Maloney, 296 F.3d 48, 51 (1st Cir. 2002); Goodrich v. Hall, 448 F.3d 45, 47 (1st Cir. 2006).

In state court, the nature or presentation of the claim must have been "likely to alert the court to the claim's federal nature." Nadworny v. Fair, 872 F.2d 1093, 1097 (1st Cir. 1989) (quoting Daye v. Attorney Gen. of New York, 696 F.2d 186, 192 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984)). While it is difficult to draw bright lines regarding what constitutes "fair presentment," Nadworny, 872 F.2d at 1101 n.4, it is clear "that the mere incantation of constitutional buzzwords, unaccompanied by any federal constitutional analysis, does not suffice to carry the burden of demonstrating fair presentment of a federal claim." Adelson v. DiPaola, 131 F.3d 259, 263 (1st Cir. 1997); see also Gagne v. Fair, 835 F.2d 6, 7 (1st Cir. 1987) ("oblique" reference to "due process" not enough); Dyer v. Ponte, 749 F.2d 84, 86-87 (1st Cir. 1984) ("cursory references" to due process and fourteenth amendment raise doubts about sufficiency of presentment).

The possible ways of satisfying this obligation include, but are not limited to: "(1) citing a specific provision of the Constitution; (2) presenting the substance of a federal constitutional claim in such manner that it likely alerted the

state court to the claim's federal nature; (3) reliance on federal constitutional precedents; and (4) claiming a particular right specifically guaranteed by the Constitution." <u>Gagne</u>, 835 F.2d at 7. While this list is illustrative, "it does not purport to be exhaustive." <u>Barresi</u>, 296 F.3d at 52.

Evans' brief to the Supreme Judicial Court expressly referred to Claim 3(c) in the heading of Point VI. Both Evans and the Commonwealth agree that the heading of Point VI explicitly stated that the admission of Marvette Neal's extrajudicial statements were an "abuse of discretion in violation of the defendant's right to *confrontation and due process*." Resp. Mem. at 13; Petitioner's Reply Memorandum in Support of Petition for Writ of Habeas Corpus [Doc. No. 11] ("Pet. Reply") at 7 (emphasis added). This reference alone arguably is enough to satisfy the exhaustion requirement because Evans claimed a right specifically guaranteed by the United States Constitution. <u>See</u> <u>Gagne</u>, 835 F.2d at 7. There are, however, at least two additional reasons why Evans' claim is, in fact, exhausted.

First, Evans' legal analysis, as communicated to the Supreme Judicial Court, relied on <u>Commonwealth</u> v. <u>Daye</u>, 393 Mass. 55, 74 (1984), which in turn had relied on the Supreme Court's federal constitutional analysis in <u>California</u> v. <u>Green</u>, 399 U.S. 149, 170 (1970). This constitutes presentment of the federal constitutional issue because Evans both claimed a right

guaranteed by the Constitution and relied on a state case that specifically invoked federal constitutional precedent. See Goodrich, 448 F.3d at 48 (finding exhaustion of a federal claim where a habeas petitioner "primarily relied . . . on a state case invoking federal due process").

Second, the closing paragraph of Point VI argued that the admission of Neal's testimony was not "harmless beyond a reasonable doubt" because "the defendant's right[] to confrontation" was violated. To support the argument, Evans included the following citation: "Commonwealth v. Vinnie, 428 Mass. 161, 164 (1998), citing Chapman v. California, 386 U.S. 18, 24 (1967)." This citation likewise qualifies as reliance on a federal constitutional precedent and in all probability alerted the Supreme Judicial Court to the federal nature of the claim. See Gagne, 835 F.2d at 7. Indeed, Evans never made a separate argument based on the distinctive language or history of the cognate state constitutional provisions. See Nadworny v. Fair, 872 F.2d 1093, 1099 (1st Cir. 1989) (distinctive "state-law formulations should most often be construed as raising purely state-law issues"). Since Evans' state constitutional claim was "indistinguishable from one arising under federal law," it is exhausted. Id. at 1099-1100 (citing Picard, 404 U.S. at 277).

**D.    The Supreme Judicial Court's Determination of the Facts**

Evans alleges that the Supreme Judicial Court applied improper standards in determining the facts upon which its legal analysis was grounded. Pet. Mem. at 1-2. Federal habeas courts must grant deference to state court factual determinations. 28 U.S.C. § 2254(e)(1). "The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes a finding of fact." Norton, 351 F.3d at 6 (citing Sumner v. Mata, 455 U.S. 591, 593 (1982))

To satisfy the statute, Evans must show that the state's factual determination was objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing Williams, 529 U.S. at 399). Objective unreasonableness is not merely an incorrect or erroneous decision. Williams, 529 U.S. at 410; Ward v. Sternes, 334 F.3d 696, 703-04 (7th Cir. 2003) ("[P]etitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error."); Dennis v. Mitchell, 354 F.3d 511, 518 (6th Cir. 2003) ("[A] federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination.").

Moreover, section 2254(d)(2) should be interpreted in conjunction with section 2254(e)(1), which specifies that "a determination of a factual issue made by a State court shall be

presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001); see also Miller-El, 537 U.S. at 341 (noting that to prevail under section 2254(d)(2), a habeas petitioner must both disprove the factual finding by clear and convincing evidence and demonstrate that the state court's factual determination was objectively unreasonable).

A habeas petitioner can overcome a state court's factual findings by showing that they were based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(2); Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001). This analysis applies only to determinations of basic, primary, or historical facts. Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002). "Inferences, characterizations of the facts and mixed fact/law conclusions are more appropriately analyzed under the 'unreasonable application prong.'" Id.

First, Evans alleges that the Supreme Judicial Court improperly applied the standard for insufficient evidence announced in Jackson v. Virginia, 443 U.S. 307 (1979), rather than using the standard for determining prejudice under Strickland v. Washington, 466 U.S. 668 (1984). Pet. Mem. at 54-55. According to Evans, the Supreme Judicial Court incorrectly determined the facts in a light more favorable to the

prosecution, <u>Jackson</u>, 443 U.S. at 319, rather than considering the totality of the evidence, <u>Strickland</u>, 446 U.S. at 695. <u>Id.</u>

Evans has failed, however, to point to any specific facts relied upon by the Supreme Judicial Court that were wrong. Instead, Evans has conflated this argument with his ineffective assistance of counsel claim. Pet. Mem. at 54-57 (criticizing the state court for "ignoring the many inconsistencies and anomalies in the testimony of prosecution witnesses and overlooking exculpatory evidence introduced by the defense at trial"). Under <u>Strickland</u>, however, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the . . . jury acted according to the law." 466 U.S. at 694. Evans has not challenged the sufficiency of the evidence. Therefore, the facts recited by the Supreme Judicial Court necessarily must harmonize with the jury verdict. <u>See</u> <u>id.</u> For the most part, they do.

It is true that the references to the involvement of Brown and Tinsley in the murder in the fact section of the Supreme Judicial Court decision, <u>Evans</u>, 439 Mass. at 187 — to the extent that they cast these two as joint venturers with Evans and John — may have been an unreasonable application of <u>Strickland</u> in light of the jury acquittal. These references are, however, essentially irrelevant to Evans' habeas claim. Furthermore, the references to the involvement of Brown and Tinsley did not taint

the Supreme Judicial Court's analysis of Evans' ineffective
assistance of counsel claim.  Therefore, even if they presented
Strickland error, it was harmless beyond a reasonable doubt.
Chapman, 386 U.S. at 24.

### E.    Evidentiary Rulings at Trial

Evans alleges that the state court's admission of testimony
and evidence from Alton Clarke and Marvette Neal violated Evans'
constitutional rights of confrontation and due process. Pet. Mem.
at 44.

### 1.    Testimony of Alton Clarke

Evans was restricted in his cross-examination of Alton
Clarke and not allowed to ask about specific charges then pending
against him in Suffolk County. Pet. Mem. at 45. In his
discretion, the trial judge limited the description of the
charges as "serious felony charges" without naming the specific
crimes, which included aggravated rape, kidnaping, and assault
and battery with a dangerous weapon. See Pet. Mem. at 45.[8] Clarke
was in Walaikum's during the murder and witnessed the shooting.
Pet. Mem. at 45; Evans, 439 Mass. at 187. He made a 911 phone
call at the time, but did not come forward to the police until
nine months after the shooting——two months after he was indicted

---

[8] Clarke was later tried and convicted. See Commonwealth v.
Clarke, 60 Mass. App. Ct. 1105 (2003) (affirming guilty verdicts
for two rape charges and a kidnaping charge).

on the rape, kidnaping, and assault charges. Pet. Mem. at 11, 45;
Evans, 439 Mass. at 187.

When there is evidence of bias, a defendant has a
constitutional right to cross-examine a witness about the issue.
Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). The trial
judge retains discretion to limit the scope of cross-examination
"based on concerns about, among other things, harassment,
prejudice, confusion of the issues, the witness' safety, or
interrogation that is repetitive or only marginally relevant."
Id.; see also Davis v. Alaska, 415 U.S. 308, 316-17 (1974);
United States v. Abel, 469 U.S. 45, 50 (1984) (explaining that
Davis v. Alaska "holds that the Confrontation Clause of the Sixth
Amendment requires a defendant to have *some* opportunity to show
bias on the part of a prosecution witness.") (emphasis added).

The trial judge in this case limited the evidence of Alton
Clarke's pending charges in response to the prosecutor's argument
that the aggravated rape charges would be "disturbing and highly
prejudicial." Trial Transcript Vol. VI p. 75. Evans was able
adequately to explore the nature of Clarke's bias and motive to
cooperate with the prosecution arising from the serious felony
charges without referring to the specific charge. Evans, 439
Mass. at 189. "Clarke testified emphatically that he was promised
nothing and he expected nothing." Id. This decision was not an
abuse of discretion and was neither contrary to nor an

31

unreasonable application of clearly established Supreme Court precedent.

### 2.    Testimony of Marvette Neal

Similarly, the state court's admission of Marvette Neal's prior inconsistent statements to the grand jury and detailed statements to the police was neither contrary to nor an unreasonable application of Supreme Court precedent. See 28 U.S.C. § 2254(d).

When called to the witness stand by the prosecution, Marvette Neal testified that he did not remember seeing the Evans brothers at Walaikum's on the night of the shooting, that he was unable to identify the shooters, and that he never identified Jimmy Evans to the police as Jackson's assailant. Pet. Mem. at 50-51.

Over objection, the prosecutor was permitted to introduce Neal's grand jury testimony in which he stated that he saw the Evans brothers inside Cortee's and Walaikum's on the night of the shooting. Pet. Mem. at 51. The grand jury testimony was admitted under the "past recollection recorded" exception to the hearsay rule. Evans, 439 Mass. at 189-90. The court allowed the admission of this testimony as substantive evidence. Id. at 189.

Furthermore, the prosecution was allowed to introduce the testimony of Detective Kenneth Dorch who stated that about three weeks after the shooting, Neal made a detailed statement about

the shooting in which he identified Evans and his brother as the shooters. Pet. Mem. at 51. Dorch's testimony included evidence that Neal made a photo identification of Evans and his brother as the shooters. Pet. Mem. at 51. The judge instructed the jury six times during Dorch's testimony that the evidence contained therein could not be considered substantively, but only for evaluating the credibility of Neal. Evans, 439 Mass. at 191.

### a. Neal's Grand Jury Testimony

The Supreme Judicial Court ruled it was error to admit Neal's grand jury testimony as past recollection recorded because the fourth element of the rule was not met. Evans, 439 Mass. at 190 (stating that "Neal had no recollection of what he had told the grand jury and there was no evidence that he adopted the minutes of his grand jury testimony when his memory of events was fresh."). After concluding that Neal's grand jury hearsay testimony was erroneously admitted, the Supreme Judicial Court examined its impact for prejudicial error under Commonwealth v. Martinez, 431 Mass. 168, 176, 176 n.7 (2000); Evans, 439 Mass. at 190-91. Ultimately, the Supreme Judicial Court ruled "no prejudice," Evans, 439 Mass. at 191, because "Neal's grand jury testimony about the defendants' presence inside both establishments was merely cumulative of other testimony." Id. (enumerating the other testimony that placed Evans inside both

33

Cortee's and Walaikum's including Evans' own admissions on the stand).

Evans alleges that the Supreme Judicial Court's use of the Martinez "prejudicial error" standard is contrary to the holding of Chapman v. California, 386 U.S. 18, 24 (1967) (holding that before a federal constitutional error can be held harmless the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt). See Pet. Mem. at 61.

In this instance, it must be remembered, Neal testified and was available for cross-examination. The Supreme Court has stated that "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.'" United States v. Owen, 484 U.S. 554, 559 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987)). Since Neal was available for cross-examination and stated that he did not remember what he had testified to the grand jury but thought he had been truthful at the time, Evans cannot successfully argue that his Sixth Amendment right to Confrontation was violated. See id. (ruling that the constitutional right to cross-examine is sufficiently established when a past belief is introduced, but the witness is unable to recollect the reason for the past belief, so long as "other means of impugning the belief are available.").

On the stand, Neal testified that he denied telling the police that Evans and his brother were the shooters. Trial Transcript Vol. IV, p. 193-95. Evans' counsel was then able to cross-examine the witness further to clarify that he identified photographs as Evans and John, but did not identify them as the shooters. Id. at 198-99. Under these circumstances, where Evans had an opportunity for effective cross-examination, the Supreme Judicial Court's decision was neither contrary to nor an unreasonable application of United States v. Owen.

Even were the Supreme Judicial Court's harmless error analysis contrary to or an unreasonable application of Chapman, its resolution of Evans' appeal ought not be disturbed since Chapman is not the controlling case. The Supreme Court has held that a less onerous standard of review should apply to claims of trial type constitutional error raised on habeas review. See Cruz v. New York, 481 U.S. 186, 193-94 (1987) (stating that Confrontation Clause violations are trial type error); see also Sinnott v. Duval, 139 F.3d 12, 14-15 (1st Cir. 1998). Under this standard, Evans is not entitled to habeas relief for the constitutional error unless it had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Kotteakos v. United States, 328 U.S. 750, 776 (1946); see also Sinnott, 139 F.3d at 14-15 (stating that the "Supreme Court has made it clear

that on collateral review of habeas cases involving trial error,
the test for harmless error" is that set forth in <u>Brecht</u>).

Neal's grand jury testimony that he saw Evans in Walaikum's
on the night of the shooting was cumulative of that of other
witnesses who so testified. Marcello Holliday saw Evans enter
Walaikum's. Trial Transcript Vol. III, pp. 41, 44-48. Alton
Clarke testifed that the two shooters entered the driver and
front passenger's seats of the Lexus automobile, and Evans
admitted getting into the passenger side upon leaving the scene.
<u>Id.</u> at Vol. VI, pp. 85-86, 89-90 & Vol. IX, P. 21. Thus, the
admission of Neal's grand jury testimony, in which he claimed to
have seen Evans and his brother in Walaikum's on the night of the
murder, did not have a substantial and injurious effect on the
jury's verdict.

### b. Testimony of Detective Dorch

Evans also argues that the admission of Detective Dorch's
testimony as impeachment evidence was a violation of his rights
to Confrontation and Due Process. Pet. Mem. at 50-51. Prior to
Dorch's testimony, the judge instructed the jury that Neal's
prior statement could not be considered evidence of what actually
happened on the night of the shooting, but only for evaluating
the credibility of Neal. Trial Transcript Vol. V, pp. 14-15.

The admission of impeachment testimony through prior
inconsistent statements is an issue of state evidentiary law, and

36

errors of state law do not provide a basis for federal habeas corpus relief. <u>Estelle</u> v. <u>McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Lewis</u> v. <u>Jeffers</u>, 497 U.S. 764, 780 (1990). It is not the province of a federal habeas court to reexamine state court determinations of state law questions. <u>Lewis</u>, 497 U.S. at 780-81. A federal court may issue a writ of habeas corpus only when a conviction violates the constitution, laws or treaties of the United States. 28 U.S.C. §§ 2241, 2254; <u>Estelle</u>, 502 U.S. at 67-68. "Even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment," a federal court may not issue a writ to redress such a deprivation if the claims are merely ancillary to perceived errors of state law. <u>See</u> <u>Pulley</u> v. <u>Harris</u>, 465 U.S. 37, 41 (1984).

The claim regarding Detective Dorch's testimony is governed by state evidentiary law and, therefore, does not provide a proper basis for federal habeas relief. <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68; <u>Lewis</u>, 497 U.S. at 780. Even if we were to evaluate this claim under Supreme Court precedent, it is clear that prior inconsistent statements are admissible to impeach a witness's testimony. <u>United States</u> v. <u>Hale</u>, 422 U.S. 171, 176 (1975). When Neal testified on cross-examination that he never saw Evans with a gun and never saw him shoot anyone, this opened the door to impeachment through Dorch's testimony of Neal's prior statements.

_Evans_, 439 Mass. at 192. There was no error in the admission of Dorch's testimony and, therefore, it was neither an unreasonable application of nor did it result in a decision that was contrary to clearly established federal law.

**F.    Ineffective Assistance of Counsel**

Evans' ineffective assistance claim is governed by the principles established in _Strickland_ v. _Washington_, 466 U.S. 668 (1984). He must show that counsel's performance fell below an objective standard of reasonableness and that the sub-standard performance prejudiced him —— that is, but for counsel's errors there is a reasonable probability that the result of the trial would have been different. See _id._ at 687-88, 694. Evans has not met this burden.

Evans claims that the Supreme Judicial Court's determination that trial counsel was not ineffective for his failure to retain an investigator and to hire forensic experts is an unreasonable application of the _Strickland_ standard for determining ineffective assistance of counsel. Pet. Mem. at 31-43. Evans also claims that the Supreme Judicial Court failed to apply the proper standard for prejudice and therefore the decision was also contrary to _Strickland_ in that respect. Pet. Mem. at 55-61; see also _supra_ Part D.

Evans states that his counsel completely failed to investigate the evidence or consult with a single forensic

38

expert. Pet. Mem. at 34. He argues that his trial "hinged so
critically on forensic evidence." Pet. Mem. at 41. A close
analysis of the record reveals that these statements are not
true.

First, contrary to Evans' claim, his trial counsel did not
completely fail to investigate the evidence. Evans' brother John
had his lawyer hire an investigator to examine the evidence, and
Evans' lawyer had access to all of these findings. Affidavit of
Trial Counsel, Phillip W. Halloran, Esq. ("Halloran Aff.") at 3
*in* Petitioner's Appendix E of Pet. Mem. at 64a. With regard to
different types of experts, trial counsel stated in his affidavit
that he "was not aware at the time of any advantage in consulting
with" any of these experts. Halloran Aff. at 1-2. This reflects
trial counsel's reasonable belief that such tests would not have
furthered the defense in any significant way.

Second, only the forensic tests introduced by the
Commonwealth linked the guns from the Lexus to the shooting at
Walaikum's. Significantly, Evans does not challenge this
evidence. Instead, Evans speculates that a blood expert could
have found that Tinsley was the shooter by analyzing blood
spatters found on his coat. Pet. Mem. at 35. At trial, however,
the prosecutor admitted that the blood found on Tinsley's coat
could have been the victim's. In fact, most of the blood was on
the back of Tinsley's coat, which hardly suggests that it got

there while Tinsley was shooting the victim. In short, "the blood evidence was not a substantial part of the Commonwealth's case." Evans, 439 Mass. at 201.

Evans also theorizes that a ballistics expert could have examined the ordnance and firearms and a criminalist could have established defects in how the police secured the scene. Pet. Mem. at 34-35.

Evans admitted that he discharged the Ruger three times in a downward direction while standing at the entrance to Walaikum's, Evans, 439 Mass. at 201, and states that all of the evidence found at the scene "substantially supported" his story. Pet. Mem. at 39. Of course, given the restrictive dimensions of the restaurant and the fact that the victim was lying on the floor when he was shot, additional evidence corroborating Evans' story would have been entirely consistent with the Commonwealth's theory that he was aiming at the victim and not firing accidentally.

Specifically, all of the shell casings and bullet fragments from the Ruger were found outside or near the front door. Id. at 39-40. A spent bullet from the Ruger was found in the refrigerator behind the front counter toward the right side of the snack bar. Id. at 40. There was also a bullet fragment with blood on it found on the rug inside the restaurant. Id.

The Supreme Judicial Court asserted that expert analysis would not have been of any assistance because the jury could have inferred that the bloody bullet found on the rug had "passed through the victim's body" and that "there was no evidence that the bullet had been moved." Evans, 439 Mass. at 201. Evans states that "[t]hese assertions are patently unreasonable." Pet. Mem. at 36. Yet, in his brief a few pages later, he can only speculate that "in the absence of any evidence that the police had properly secured the crime scene, the location of a bullet fragment on the rug and a shell casing inside the restaurant . . . was consistent with a patron's or police officer's accidentally kicking or otherwise moving it after the incident." Id. at 40. Evans cannot prevail on this claim since he has failed to put forth any evidence demonstrating how an expert could support this assertion.

Finally, Evans asserts that a fingerprint expert could have examined the firearms and undermined the prosecution's case. Id. at 34-35. The Supreme Judicial Court found that independent fingerprint testing of the guns would not have produced anything better for the defense:

> There is no reason to believe that the Commonwealth's fingerprint expert was wrong in concluding that there was insufficient fingerprint detail on either gun to make an identification. Nor is there reason to believe that he was wrong in concluding that in only about two per cent of cases do guns yield identifiable fingerprints, and in cases where prints can be identified, the age of the print cannot be determined.

41

> Thus, fingerprint evidence also was not a substantial
> part of the Commonwealth's case. [citation omitted]
> Even if fingerprint evidence could show that Tinsley
> had once touched the Heckler & Koch handgun, it would
> not prove that John had not also touched it. Given the
> Commonwealth's eyewitness testimony that John had fired
> the Heckler & Koch, and Jimmy's admission that he fired
> the Ruger at Walaikum's, the Commonwealth's case
> against both John and Jimmy would not have been
> undermined.

Evans, 439 Mass. at 202. Where the expert testimony suggested by

Evans would not have strengthened his defense, counsel's failure

to pursue it did not constitute ineffective assistance of

counsel.

Evans' final argument that the Supreme Judicial Court failed

to consider gaps and inconsistencies in the Commonwealth's case

does not prevail because his counsel ably impeached the

eyewitnesses on cross-examination and the jury was well aware of

the inconsistencies. See, e.g., Trial Transcript vol. III, pp.

89-106 (cross-examination of Marcello Holliday); vol. IV, pp.

198-99 (cross-examination of Marvette Neal); and vol. VI, pp.

137-53 (cross-examination of Alton Clarke).

In analyzing Evans' ineffective assistance claim, the

Supreme Judicial Court concluded in sum that "there was no reason

for counsel to believe that any testing would benefit the defense

or that any hoped for results would likely have influenced the

jury's conclusion." Evans, 439 Mass. at 201. This statement

effectively applies the Massachusetts' standard of review for

evaluating first degree murder cases under Massachusetts General

Laws chapter 278, section 33E. Since this standard is more favorable to Evans than the constitutional standard for evaluating ineffective assistance claims, he cannot meet his burden of establishing deficient counsel and prejudice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992); see also Commonwealth v. Graham, 431 Mass. 282, 289 (2000) (stating that under section 33E, the Supreme Judicial Court reviews counsel's omissions to determine whether they were erroneous and likely to have influenced the jury's conclusions).

Moreover, the Supreme Judicial Court's recitation of facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) and must be rebutted by clear and convincing evidence. Sanna, 265 F.3d at 7. Evans' assertion that the jury could have drawn opposite inferences from the evidence presented does not rebut the presumption of correctness and does not demonstrate that the Supreme Judicial Court's decision was unreasonable. See Dennis v. Mitchell, 354 F.3d 511, 518 (6th Cir. 2003) ("[A] federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination.").

Since additional expert testimony from Evans would not assist the defense, his ineffective assistance of counsel claim must fail. Prejudice will not be presumed where there was good reason for trial counsel's failure to seek further testing, i.e.,

43

his time was better spent preparing to cross-examine eye witnesses who placed his client at the scene with a gun. As the First Circuit noted in <u>Genius</u> v. <u>Pepe</u>, 147 F.3d 64, 67 (1st Cir. 1998):

> Even when . . . the costs of an expert are borne by the state, pursuing any line of inquiry involves some use of time and distracts in some degree from other possible defenses that might be pursued. As the Eleventh Circuit has said, "counsel . . . is not required to pursue every path until it bears fruit or until all available hope withers." <u>Solomon</u> v. <u>Kemp</u>, 735 F.2d 395, 402 (11th Cir. 1984), *cert. denied*, 469 U.S. 1181 (1985).

Therefore, counsel's decision not to consult with experts regarding the blood, ballistics, or fingerprint evidence was not ineffective assistance of counsel.

Looking at the evidentiary record as a whole, forensic evidence pointing to Tinsley as a shooter would not have led to a different result since Evans admitted to being at the entrance to Walaikum's when his gun went off. Eyewitnesses at the scene testified that there were two shooters and unchallenged ballistic evidence recovered from both inside and outside the restaurant included shell casings and bullet fragments from the two guns thrown out of the Lexus. <u>Evans</u>, 439 Mass. at 187-88.

The Supreme Judicial Court's decision regarding Evans' ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of <u>Strickland</u> and its progeny.

**G.  Evidentiary Hearing**

Under 28 U.S.C. § 2254(e)(2):

If the applicant has failed to develop the factual
basis of a claim in State court proceedings, the court
shall not hold an evidentiary hearing on the claim
unless the applicant shows that-

(A)the claim relies on-

(i) a new rule of constitutional law, made
retroactive to cases on collateral review by the
Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been
previously discovered through the exercise of due
diligence; and

(B) the facts underlying the claim would be sufficient
to establish by clear and convincing evidence that but
for constitutional error, no reasonable factfinder
would have found the applicant guilty of the underlying
offense.

Id. Accordingly, it is necessary to trace Evans' procedural

development of the ineffective assistance claim through the state

court.

After trial, Evans filed a motion for a new trial in which

he raised ineffective assistance of counsel based on a failure to

consult with certain forensic experts. In connection with this

motion, Evans also filed a series of motions for funds to hire

such experts for the purpose of further developing his

ineffective assistance claim.  On September 10, 1999, Justice

Elizabeth Donovan denied the motion for funds, and on December

30, 1999 she denied the motion for a new trial. Evans appealed

both denials, and on September 27, 2001, Justice Judith Cowin

issued an order staying the Petitioner's appeal and remanding for

45

a new exercise of judicial discretion in light of a recent
amendment to Massachusetts Rule of Criminal Procedure 30(c)(5).
Justice Donovan subsequently denied the motion again on January
3, 2002. After a non-evidentiary hearing on February 14, 2002,
Justice Donovan again issued another order denying the motion for
funds on March 1, 2002. A motion for reconsideration and
clarification was denied on April 11, 2002. Evans filed a notice
of appeal of these post-remand orders and moved to consolidate
them with his direct appeal.

Although the factual basis for the ineffective assistance
claim was never developed in state court, Evans cannot be said to
have failed in an attempt to develop the claim under section
2254(e)(2). Several circuits have held that section 2254(e)(2)
will not preclude an evidentiary hearing in federal court where
an applicant diligently sought to develop the factual basis for a
claim, but was denied the opportunity to do so by the state
court. See McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir.
1998); Burris v. Parke, 116 F.3d 256, 258-59 (7th Cir. 1997),
cert. denied, 522 U.S. 990 (1997); Jones v. Wood, 114 F.3d 1002,
1013 (9th Cir. 1997); Love v. Morton, 112 F.3d 131, 136 (3d Cir.
1997). This means that section 2254(e)(2) only applies where a
petitioner has made a decision not to introduce evidence when he
had an opportunity to do so. See Jones, 114 F.3d at 1013. In this
case, Evans did not relinquish such an opportunity or neglect to

46

seek it, and, therefore, his request for an evidentiary hearing must be analyzed under a different standard.

The pre-AEDPA standard regarding federal habeas corpus evidentiary hearings is governed by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992) and Townsend v. Sain, 372 U.S. 293 (1963), both of which were superseded in part by ADEPA.  Under this standard, an evidentiary hearing may be conducted only if the habeas petitioner alleges facts which, if proved, would entitle him to relief and the state court - for reasons beyond the control of petitioner - never considered the claim in a full and fair hearing. Keeney, 504 U.S. at 11; Townsend, 372 U.S. at 312. Evans has not alleged sufficient facts to warrant an evidentiary hearing.

As stated by the Supreme Judicial Court and herein, the Commonwealth's case relied primarily on eyewitness testimony and the unchallenged link between the murder and the two handguns tossed from the Lexus. The Commonwealth's case did not rely heavily on blood, forensic, ballistics, or fingerprint evidence. In fact, the Commonwealth's experts produced no conclusive evidence linking Evans to the crime and, more importantly, he has failed to show that any potential experts would produce evidence that would be significantly exculpatory.

In his Reply Memorandum, Evans contends that the above argument is "fundamentally flawed" and cites Holmes v. South

47

*Carolina*, -- U.S. --, 126 S. Ct. 1727 (2006) for the proposition that "the true strength of the prosecution's proof cannot be assessed without considering [the defendant's] challenges to the reliability of the prosecution's evidence." Pet. Reply at 11-12; *Holmes*, 126 S. Ct. at 1734. This case is readily distinguishable.

First, *Holmes* involved a direct appeal to the Supreme Court, whereas the case at bar implicates a collateral attack on a criminal conviction. This is significant because review is more limited in the habeas context than it is in the realm of a direct appeal. See *Daniels* v. *United States*, 532 U.S. 374, 381 (2001); *Reed* v. *Farley*, 512 U.S. 339, 359 (1994). Additionally, Evans has misconstrued the Commonwealth's argument and seems to misunderstand the holding in *Holmes*. Specifically, in *Holmes*, the prosecution submitted overwhelming evidence of guilt including palm-print, blood, fiber, and DNA evidence that affirmatively linked the defendant to the crime. *Holmes*, 126 S. Ct. at 1730. The trial court precluded the defendant from introducing potentially exculpatory third party culprit evidence. *Id.* In vacating and remanding the conviction, the Supreme Court stated that the defendant was constitutionally entitled to present a "complete defense" including all probative evidence tending to undermine the strength of the state's forensic evidence. *Id.* at 1729, 1735.

The difference in this case, however, is that the Commonwealth did *not* rely heavily on forensic evidence, whereas the gravamen in <u>Holmes</u> was forensic evidence. Evans wants to test the strength of evidence that the Commonwealth concedes is already weak. Further, even if additional evidence could prove definitively that Tinsley was one of the shooters, this does not help Evans because the eyewitnesses stated there were two shooters. Evans has already admitted that he discharged the Ruger at the entrance to Walaikum's, and a bullet fragment fired from the Ruger was found on a rug in the middle of the floor. Therefore, Evans has failed to fulfill the standard under <u>Keeney</u>/<u>Townsend</u>. The merits of this habeas petition can be decided on the record, and Evans is not entitled to an evidentiary hearing because he has not established that the failure to develop his ineffective assistance of counsel claim actually prejudiced his case.

## IV.  CONCLUSION

Accordingly, Evans' petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus [Doc. No. 1] is DENIED.

SO ORDERED.

/s/ William G. Young
_____
WILLIAM G. YOUNG
DISTRICT JUDGE